**Milton Musa PACHECO, Plaintiff,**

v.

**Anita COMISSE; Thomas A. Coughlin, III; Paul Levine; John & Jane Does [S.C.F.]; John & Jane Does [Central Office]; Louis F. Mann, Defendants.**

**No. 92-CV-1658.**

United States District Court, N.D. New York.

Aug. 29, 1995.

Milton Musa Pacheco, pro se.

Lawrence L. Doolittle, Assistant Attorney General, Dennis Vacco, Attorney General of the State of New York, for defendants.

KAPLAN, District Judge.*

Milton Musa Pacheco brings this action *pro se* pursuant to 42 U.S.C. § 1983 against New York State Department of Correctional Services ("DOCS") officials for alleged violations of his First, Fourth, Fifth, Sixth and Fourteenth Amendment rights while he was an inmate at Shawangunk Correctional Facility ("SCF"). Defendants are Superintendent Mann and former Commissioner Coughlin, respectively the heads of SCF and DOCS during the events in question; Anita Comisse, senior mail clerk at SCF; and Paul Levine, the Deputy Superintendent of Program Services at SCF. They move for summary judgment dismissing the complaint.[1] There are three main issues.

---

\* Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, sitting by designation.

1. In the course of 200 pages of handwritten affidavits, plaintiff made further allegations of mail tampering by defendants since the initiation of this action and in violation of an order by Magistrate Judge Hurd. (Pl.Aff. I ¶¶ 53–55; Pl. Aff. II ¶ 13) Inasmuch as those issues have not been raised in a supplemental complaint and have not been addressed in this motion, we do not consider them here. Plaintiff may seek relief for any of these alleged violations from the proper court in the Northern District of New York.

First, plaintiff claims that Mann prevented plaintiff from attending the trial of a claim he was pursuing in the New York Court of Claims against the State of New York in order to retaliate for other litigation and complaints brought by plaintiff, that plaintiff's case therefore was dismissed with prejudice, and that Coughlin is responsible for Mann's actions. Defendants respond that plaintiff legitimately was prevented from attending the trial because he refused to submit to tuberculosis ("TB") testing.

Second, defendants allegedly obstructed plaintiff's legal mail. Defendants argue that plaintiff did not show that the letters in question were legal mail, as required by DOCS regulations.

Third, plaintiff claims that the elimination of a subsidy for inmates' non-legal mail violates the First Amendment. The Court previously has addressed and rejected this claim in *Dawes v. Carpenter*, 899 F.Supp. 892, 898 (N.D.N.Y.1995), and it is rejected here for the same reasons.

### *The Alleged Retaliation Against Plaintiff*

#### *The TB Test and Plaintiff's Court Date*

Mann prevented plaintiff from attending the trial of plaintiff's claim against the State of New York; the main issue here is his reason for doing so. Plaintiff claims that Mann wanted to retaliate for plaintiff's numerous administrative complaints against Mann, his frequent litigation against DOCS, and a confrontation plaintiff had with SCF correction officers approximately three weeks before his trial date. Defendants contend that plaintiff was confined because his nine month refusal to take a TB test made him a health risk. Plaintiff acknowledges that he refused to take the TB test in question, but claims that he did so for religious reasons, that Mann knew he was amenable to other forms of testing, and that Mann's use of DOCS TB testing policy to justify depriving plaintiff of his day in court was pretextual because plaintiff did not present a health risk. Indeed, plaintiff claims that in the nine months preceding the court date, Mann ap-

plied the TB policy in a manner inconsistent with the supposed health threat. Moreover, plaintiff alleges that Coughlin is liable as well because plaintiff told him about Mann's behavior in a series of letters but the problem nevertheless was not addressed.

On November 29, 1991, in response to an unspecified health emergency, Glenn S. Goord, Deputy Commissioner of DOCS, ordered all facility administrators in the DOCS system to administer the Mantoux Tuberculin (PPD) Skin Test (the "Test") to inmates in their facility. To further limit the potential spread of TB, Goord required that "[i]nmates who refuse to take the [TB] test after counseling should be medically keeplocked until the test is taken. No out-of-cell activity will be permitted for these inmates due to the existing medical emergency." (Def. 10(j) Ex. B)

The Test is performed by injecting a serum derived from the bacterium that causes TB into the skin on the patient's arm. (Pl. Aff. I ¶ 9; Def. 10(j) Ex. B) Plaintiff, an orthodox Muslim, claims that he is prohibited from voluntarily ingesting this bacterium because, as he interprets the Qur'an, it would defile his body in the same manner as would the voluntary ingestion of poison or alcohol. (Pl.Ex. A–16) In addition, plaintiff has other non-religious objections to the Test not relevant here. He therefore refused to submit to the Test.

A second order sent by Goord on December 12, 1991 suggests that plaintiff's religious objections were not unique in the DOCS system, as indeed does Judge Koeltl's recent decision in *Jolly v. Coughlin*, 894 F.Supp. 734 (S.D.N.Y.1995). The Goord order says in relevant part:

"The only out-of-cell activity which should be permitted is one shower per week. No out-of-cell exercise periods, visits, legal visits, attendance at congregate religious services, etc. are permitted during this medical emergency for inmates who refuse to be tested. Inmates who refuse to take the test for religious reasons may be permitted to get a chest x-ray in lieu of the current testing procedures. This alternative method of testing must be requested via electronic mail to Dr. Greifinger. In the e-

mail, you must indicate the specific circumstances, i.e. which religious reason, to justify the chest x-ray." (Def. 10(j) Ex. B)

Despite this instruction, Mann made no accommodation for religious objectors at SCF. His December 23, 1991 directive to SCF personnel about the TB policy provided, in its entirety, that "inmates who have refused the T.B. testing procedure will remain in medical keeplock status until they agree to be tested. They will be deprived of *all* outside-of-cell activity *except* they will be permitted *one* (only) shower per week. No other [outside of] cell activity without express permission of the Superintendent or his designees. [*sic* ]" (Def. 10(j) Ex. B) (emphasis in original) It appears that plaintiff was the only religious objector at SCF (Pl.Ex. A–6); the refusal to accommodate religious objectors at SCF therefore affected only him.

When Goord's first order was given, and apparently for the duration of the events in question, plaintiff was confined to SHU for disciplinary reasons. (Pl.Aff. I ¶ 11) To coerce plaintiff into taking the Test, Mann denied exercise and visitation privileges normally available to inmates in SHU and limited shower privileges to once per week. (Pl. Exs. A–4, A–6, A–14, A–33)

Plaintiff asserted to Mann on January 3, 1992 that the stringent confinement violated plaintiff's rights to freedom of religion and to basic privileges while confined to SHU. Mann allegedly responded that he was "agitated and frustrated" that an inmate had refused the Test while under his authority and that he was "going to make sure that [plaintiff] did not get any form of activities unless it was his (Mann's) wishes [*sic* ]." Plaintiff claims that he then asked Mann what gave Mann these powers; Mann allegedly replied "he was the boss here." When plaintiff then threatened to file another grievance, Mann allegedly responded that he

was frustrated by the continuous filing of grievances by plaintiff, but that "it did not matter" because plaintiff was not going to get any relief because "[Mann] said so." (Pl. Aff. I ¶ 22) Mann sent plaintiff a letter on January 10 in which he referred to the January 3 conversation and reiterated his agitation and frustration. (Def. 10(j) Ex. C)

Plaintiff claims Mann later prevented an attorney from Prisoner Legal Services ("PLS") from interviewing plaintiff about an alleged beating of plaintiff by correction officers on January 19, 1992, on the ground that plaintiff had refused the Test. A letter from PLS to DOCS counsel, sent immediately thereafter, notes that "if DOCS truly believed that Mr. Pacheco was actively contagious he should be in medical isolation, not confined to an SHU cell" and that "even in cases where medical confinement was warranted" the attorney writing the letter "had visited inmates in medical isolation using the type of respiratory filter/mask which is commonly available in prison infirmaries." PLS threatened litigation unless it was permitted to interview plaintiff on a non-contact basis. The interview took place on January 27. (Pl. Aff. ¶ 17(i)1; Pl.Ex. A–9)

Shortly after this interview, plaintiff asked that he be tested with chest x-ray, in accord with Goord's suggested alternative for religious objectors to the Test. (Pl.Ex. A–11) Plaintiff further alleges that he communicated his desire to Mann on numerous occasions verbally. No chest x-ray or other alternative test ever was performed. (Pl.Aff. I ¶ 9)

Between plaintiff's request for testing by chest x-ray and the summer of 1992, he was permitted to leave his cell, other than to take a shower or participate in a non-contact legal visit, only once.[2] On February 25, 1992 he was taken, pursuant to court order, to a hearing in Shawangunk Town Court in which he was a criminal defendant. No special

---

**2.** Plaintiff avers generally that he has been permitted a number of privileges involving contact with people in the prison. (Pl.Aff. ¶ 19) Other than the February 25, 1992 court visit, however, plaintiff does not allege that any of these privileges were available prior to August 24, 1992, the scheduled date of his Court of Claims trial.

Plaintiff alleges also that he twice was required to leave his cell in January 1992, once to permit

DOCS officials to spray his room for insects and once to attend a disciplinary hearing. (Pl.Ex. A–8) He later complained to Coughlin that these releases from confinement were inconsistent with the supposed medical reasons behind it. Coughlin ordered disciplinary hearings against plaintiff to be postponed until medical keeplock was discontinued. (Pl.Ex. A–14)

precautions were taken at the hearing to deal with the health risk he allegedly posed. (Pl. Aff. I ¶ 37)

Even though plaintiff appeared in Shawangunk Town Court in February, in the early summer of 1992 Mann told an Assistant Attorney General scheduled to conduct a deposition of plaintiff in a pending federal case that the deposition could not take place because plaintiff was quarantined. (Pl.Aff. I ¶ 27) Mann's communication to the Assistant Attorney General is reflected in a subsequent opinion in that case, which refers to a letter in which "[d]efense counsel (the Assistant Attorney General) ... stated that defendants did not wish to take plaintiff's deposition at this time because plaintiff has allegedly been placed in quarantine for his refusal to submit to a tuberculosis test." (Pl.Ex. A–30) Plaintiff claims that this was pretextual as well in that he was not under quarantine and in fact did not pose a health risk. The deposition took place in any event on September 4, 1992. (Pl.Aff. I ¶¶ 27–28)

The alleged abuse of the TB policy culminated in August 1992, when Mann prevented plaintiff from attending his trial. Mann's interference with plaintiff's deposition by the Assistant Attorney General, discussed above, caused plaintiff to be concerned that Mann might interfere with the trial on the same basis. Plaintiff thus sought to adjourn the August 24, 1992 trial date in a letter to the Clerk of the Court of Claims. (Pl.Ex. A–24) The trial date was not adjourned. In subsequent correspondence plaintiff, apparently still concerned about Mann's actions, assured the Clerk that he was not in quarantine and that any such assertion by Mann was a fabrication. Plaintiff suggested also that his production at the trial would be more likely if the Court of Claims ordered it. No order was issued. (Pl.Aff. I ¶ 48)

Despite plaintiff's concerns at the time, there is no indication that Mann intended to interfere with plaintiff's court date prior to July 31, 1992. On that date plaintiff was accused of spitting at a correction officer. Plaintiff claims that Mann and he had a

confrontation about the assault on the officer shortly afterward. After the initial altercation, plaintiff allegedly asked Mann if his transportation to the trial would be affected. Mann allegedly responded in substance that plaintiff "had a lot of gall" to assault an officer and then ask if there would be any problem with his court date. Plaintiff then allegedly said that he had a constitutional right to attend the trial, to which Mann allegedly replied that Mann could "do whatever he wanted to because he had the authority to do it," that plaintiff "did not have any business suing the State anyway," and that "maybe he (Mann) could save the State some money by not letting" plaintiff go to court. (Pl.Aff. I ¶ 18) Two affidavits from inmate witnesses to this conversation support plaintiff's version of events. (Pl.Ex. C–1, C–2) Defendants do not deny that the conversation took place as plaintiff describes.

Mann allegedly made good on his threat when, some time before August 12, 1992, he told the DOCS official responsible for transporting plaintiff to trial that plaintiff could not be transported because he was quarantined. Of course, plaintiff denies that he was a medical threat and points to a number of facts made apparent to Mann that, in addition to the nine months of conduct already discussed, allegedly show the pretextual nature of Mann's justification and his true motive, including (1) an August 4 letter from PLS arguing that plaintiff's confinement for six months made any chance that he had TB remote (Pl.Ex. A–31), (2) Mann's recommencement on August 6 of disciplinary hearings against plaintiff, which previously had been adjourned pending plaintiff's submission to the Test[3] (Pl.Ex. A–34), and (3) Mann's alleged frustration with plaintiff's complaints as expressed in an August 12, 1992 letter (Pl.Ex. A–35).

Mann notified both plaintiff and the Court of Claims on August 13 that plaintiff would not be transported to trial. (Def. 10(j) ¶ 46, Ex. O) Plaintiff complained to Mann that his access to the courts was being restricted unconstitutionally, and he threatened suit un-

---

**3.** As discussed above, *supra* note 2, Coughlin previously had ordered hearings against plaintiff

postponed.

der Section 1983 to no avail. (Def. 10(j) ¶ 48, Ex. P) Mann allegedly also prevented the Court of Claims from issuing an order mandating plaintiff's presence, which plaintiff requested from the trial judge in an August 24 letter. As a result of plaintiff's default in the Court of Claims, his action was dismissed on September 14, 1992 on the defendant's motion. (Pl.Aff. I ¶ 8)

Plaintiff claims that Coughlin knew about the ongoing confrontation with Mann through a series of four letters written from December 1991 through August 1992, but nevertheless failed to control the situation. The first letter, written in December 1991, explained plaintiff's religious and other objections to the Test. (Pl.Ex. A–3) Coughlin's response, dated January 3, 1992, informed plaintiff that detention with one shower per week would continue until he took the Test and that plaintiff was the only Muslim in SCF that had refused to do so. (Pl.Ex. A–6)

Plaintiff wrote Coughlin again on January 13, 1992, complaining, *inter alia*, that Mann was punishing plaintiff for not taking the Test in a manner inconsistent with the purported medical reason for preventing him from leaving SHU. (Pl.Ex. A–8) Allegedly, DOCS officials ordered or permitted plaintiff to leave his cell when it suited their purposes, such as when plaintiff attended a disciplinary hearing or when his cell was fumigated for insects, but otherwise did not let him out. Coughlin responded on February 5. He told plaintiff that "[u]ntil you participate in the mandatory TB testing program, you will not be permitted out-of-cell activity other than one shower per week and non-contact legal visits. Future disciplinary hearings will be extended until the medical keeplock is discontinued." (Pl.Ex. A–14) Non-contact legal visits were not previously permitted to plaintiff and presumably were added in response to the January 24 letter from PLS.

The third letter was sent on July 20, 1992 along with a copy of plaintiff's letter to the Clerk of the Court of Claims seeking an adjournment of his trial. The letter to Coughlin complained about Mann's then recent behavior and asked that Coughlin prevent Mann from telling others that plaintiff was quarantined. Also, apparently in an at-tempt to preempt Mann, plaintiff argued that since he had been permitted to attend a hearing in Shawangunk Town Court in February while the TB policy was in effect, there should be no reason not to allow him to attend his trial. Finally, the letter maintains that "Mann is retaliating against me because I have filed complaints against him and his correctional personnel in this prison." (Pl. Ex. A–23(b)) There is no evidence of a response to this letter from Coughlin.

Finally, plaintiff sent a letter on August 24, the day his trial was supposed to take place. That letter accused Mann of abusing his authority in pursuit of a personal grudge by preventing plaintiff from attending his trial and reiterates instances of inconsistent application of the TB policy. Most importantly, the letter also informs Coughlin that despite prior directions, disciplinary proceedings had been recommenced against plaintiff on August 10, while plaintiff's confinement to prevent the spread of TB supposedly was still in force. Plaintiff asked Coughlin to correct the matter. (Pl.Ex. A–43) There is no evidence of a response, and as discussed above plaintiff's action in the Court of Claims later was dismissed.

*Discussion*

██ Plaintiff does not claim that he had an absolute right to attend his August 24, 1992 trial; rather, he claims that Mann's vengeful motives, inspired by plaintiff's many complaints, made confinement improper. In short, plaintiff alleges that Mann retaliated for plaintiff's exercise of his constitutional right to petition government for redress of grievances, an actionable claim under Section 1983. *Franco v. Kelly*, 854 F.2d 584 (2d Cir.1988) ("an act in retaliation for the exercise of a constitutional right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper.") *citing Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir.1987) (quoting *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979)).

Defendants respond that retaliation was not the motive behind Mann's actions, but that plaintiff's refusal to take the TB test, which allegedly made him a health risk, was

the reason he was not allowed to attend the trial. It is plain, however, that plaintiff has produced evidence that, if credited by a jury, would prove that Mann intended to retaliate against plaintiff and that the asserted justification is pretextual, including: (1) evidence of motive in that plaintiff had lodged numerous complaints against Mann, had conducted litigation against DOCS, and had an altercation with SCF officials prior to the alleged deprivation; (2) evidence that Mann applied the DOCS TB policy inconsistently and in the face of evidence that plaintiff was not a health risk; (3) evidence that Mann had a vendetta with plaintiff in that Mann did not test plaintiff for TB with any alternative means, such as by chest x-ray, as might be expected if the true concern was that plaintiff might pose a risk of infecting others; and (4) direct evidence of retaliatory intent, such as conversations in which Mann threatened plaintiff with retaliation, including just prior to the alleged deprivation. This evidence precludes summary judgment for Mann on this ground. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Lowrance v. Achtyl,* 20 F.3d 529 (2d Cir. 1994); *see also St. Mary's Honor Center v. Hicks,* ─── U.S. ───, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (evidence of that purported reason for official action is pretextual may give rise to inference that impermissible motive drove official decision).

■ Nor is the defense of qualified immunity available to Mann. Under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), an official exercising discretionary authority may be immune from liability under Section 1983 if it would have been objectively reasonable for the official to believe that the challenged action was constitutional at the time the action was taken. Here, it was clear in 1992 that the Constitution did not permit officials to retaliate against an inmate for the exercise of the inmate's constitutional right to petition government for the redress of grievances, as the Second Circuit held in *Franco v. Kelly,* 854 F.2d at 590. Thus, based on the evidence produced by plaintiff on this motion, the jury either will believe that Mann retaliated against plaintiff, in which case there will

be no qualified immunity, or that Mann did not retaliate, in which case there will be no liability. The qualified immunity defense therefore is not applicable, and defendants' motion with respect to the claim against Mann for retaliation must be denied.

■ Plaintiff alleges also that Coughlin bears responsibility for Mann's behavior. A supervisory official may be liable under Section 1983 only if the officer personally was involved in the alleged deprivation of constitutional rights. *Monell v. Department of Social Services,* 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978); *Al–Jundi v. Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). An officer who learns of a violation and fails to remedy the wrong may be liable. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). Here, plaintiff has produced four letters showing that Coughlin was informed of Mann's behavior both before and after Mann prevented plaintiff from attending his trial. Indeed, in the last letter from plaintiff to Coughlin, plaintiff specifically alleged that Mann's true intent in interfering with plaintiff's trial was to retaliate against plaintiff. There is thus evidence from which a jury could find that Coughlin knew of Mann's actions, and there is no evidence that Coughlin did anything to correct the problem. Coughlin therefore is not entitled to summary judgment on this ground.

■ Nor is Coughlin protected by qualified immunity. In *Cecere v. City of New York,* 967 F.2d 826 (2d Cir.1992), the Court held, pursuant to *Harlow,* that a supervisory official may be immune from liability if the official can show that the official had an objectively reasonable belief, at the time of the deprivation and based on the information then possessed, that the official's acts did not violate plaintiff's clearly established rights. There is no evidence in the record regarding Coughlin's actual beliefs about Mann's behavior toward plaintiff. Such evidence is necessary in order to permit the Court to evaluate whether such beliefs were objectively reasonable in light of the circumstances. *Dawes,* 1995 WL 367088, at *5, ─── F.Supp. at ───.

Summary judgment therefore must be denied with respect to this claim.

### The Alleged Interference With Plaintiff's Mail

#### Facts

Defendants are accused of interfering with plaintiff's privileged legal mail. There appear to be four issues. First, plaintiff complains that nine letters were intercepted improperly between April and October 1992, after DOCS eliminated its subsidy for free non-legal postage, and either not sent or delayed. Defendants contend that the interceptions were necessary to insure that free postage was being provided for privileged mail only. Second, plaintiff alleges that Comisse opened an outgoing legal letter outside plaintiff's presence. Third, plaintiff claims that Levine, Mann and Coughlin sanctioned the confiscation from another inmate of legal papers with plaintiff's name on them, which allegedly interfered with attempts by SHU inmates to initiate a class action suit against certain SCF personnel. Finally, plaintiff claims that the DOCS policy prohibiting postage stamps from being mailed to an inmate from outside the prison is unconstitutional. Defendants acknowledge the policy but contend that it is constitutional.

#### The Postage Policy

Comisse, senior mail clerk at SCF, is accused of refusing to send nine legal letters in 1992; Levine, Comisse's immediate supervisor, and Mann and Coughlin are accused of supporting Comisse's behavior.

Prior to April 1992, DOCS provided free postage in a limited amount both for privileged and non-privileged mail. It thus was not necessary for purposes of determining which letters merited free postage to evaluate each letter for privileged or non-privileged content. This changed when the subsidy was eliminated in April 1992, and free postage thereafter was provided for privileged mail only. It then became necessary to determine what category—privileged or non-privileged—a letter was in. Thus, although the definition of what constituted legal mail did not change with the elimination of the subsidy, DOCS administrators necessarily began requiring proof from the inmate that a particular letter was legal mail. For example, whereas before the elimination of the subsidy a letter was assumed to contain privileged material if the addressee was identified as a lawyer with the addition of "Esq." after the person's name, after the policy was changed further documentation of the identity of the addressee sometimes was required from the inmate. It appears also that Comisse used the New York Lawyer's Diary and her own personal ledger of lawyers' and legal organizations' names to check if mail was privileged. When more proof was needed, the letter was returned to the prisoner with a request for further proof. (Def. 10(j) Exs. G, J)

Plaintiff claims that the change in the standard of proof required to show that a letter qualified as legal mail was improper. DOCS defined privileged mail in a document called Directive 4421, which had been in effect since before the elimination of free non-privileged mail. (Def. 10(j) Ex. A ¶ II) Plaintiff argues that Directive 4421 establishes the quantum of proof required to show that mail to a lawyer addressee was privileged. The relevant section says:

> Attorney: One who is duly admitted to the practice of law; he or she need not be formally retained by, or be the attorney-of-record for the inmate. This shall include individual attorney's and law firms. *"Esquire" or "Esq." shall be an acceptable means of identifying an individual as an attorney.* (emphasis added) (*Id.* ¶ II(A)(5)(a))

Plaintiff maintains that DOCS could not keep the definition of privileged mail in Directive 4421 without also keeping this standard of proof. Plaintiff argues that he met that standard in all nine instances at issue.

#### The Mailing Delays

Turning to specific letters, plaintiff was told by Comisse, Levine and Coughlin that he would have to submit more information to establish privilege for some letters. Instead of providing more proof for the initial batch of rejected letters in June 1992, plaintiff initiated a series of complaints to the effect that Directive 4421 established the only legitimate standard of proof and that despite Comisse's

request no further proof would be forthcoming. After a delay of a few weeks, the initial batch of four letters later was mailed by the end of June or beginning of July 1992. There is no evidence that plaintiff was prejudiced by the delay. Furthermore, although plaintiff claims that DOCS refused to send two further letters, addressed to Salvatore Tio, Esq. and Leslie Jones, Esq., the record is devoid of any evidence with respect to them. (*Id.* Exs. G, J)

Plaintiff and defendants were at loggerheads over whether the remaining three letters were privileged. Two of the letters were to attorneys whom plaintiff claims were listed in the New York State Lawyer's Diary and Manual, but whom defendants say were not so listed. However, the letter to one of these attorneys eventually was mailed, and plaintiff has submitted no evidence that he suffered prejudice by the delay. With respect to the other letter, to Carmen Pacheco, an attorney allegedly unrelated to plaintiff, there was confusion over whether she was a listed member of the Bar in the New York State Lawyer's Diary and Manual. She is not listed in the 1992 edition, which was the up-to-date version when plaintiff attempted to send his mail, NEW YORK STATE LAWYER'S DIARY AND MANUAL p. 777 (1992 ed.), although she is listed in the 1991 edition, which evidently was the one available to plaintiff. NEW YORK STATE LAWYER'S DIARY AND MANUAL p. 777 (1991 ed.). The letter to her appears never to have been mailed.

The third letter was to the Malcolm X Legal Foundation. Defendants told plaintiff in a number of letters that this was not a recognized legal organization within the meaning of Directive 4421 and that the letter would not be sent without further documentation. (Def. 10(j) Exs. G, J) Plaintiff claims that he provided further documentation, specifically an advertisement from an Islamic magazine, to Levine, who allegedly told plaintiff that this was insufficient. The advertisement gives an address and indicates that the Foundation "provides affordable legal services" to Muslim inmates. (Pl.Ex. J–1) Defendants have not submitted any evidence regarding why they thought the Malcolm X Legal Foundation was not a legal organization within the meaning of Directive 4421. Plaintiff claims that the refusal to send this letter prejudiced his ability to recruit counsel. Plaintiff alleges also that Comisse opened his letter to the Malcolm X Legal Foundation outside his presence, but has submitted no evidence that he was prejudiced by this.

*Alleged Confiscation of Legal Documents*

Finally, plaintiff complains about the confiscation of legal documents and periodicals with plaintiff's name on them from another inmate. Plaintiff alleges that these documents were redacted copies of papers obtained from PLS which were to be exhibits in a class action lawsuit by SHU inmates against various SCF personnel. (Pl.Aff. II ¶ 13) Plaintiff does not claim that the documents were his property or that his ability to participate as a member of the purported class was impaired.

*Discussion*

█ Plaintiff first claims that constitutional requirements of due process do not allow defendants to require more proof that a letter was privileged than is set out as adequate in Directive 4421. Specifically, plaintiff sent several of letters to persons he identified as attorneys by adding "Esq." to the name in the address, which Directive 4421 says is sufficient to identify the addressee as an attorney, and yet those letters were not sent or were delayed.

█ A prisoner must have a liberty interest before challenging its denial without due process. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Until recently, protected due process liberty interests could be found in the dictates of a prison regulation if the regulation mandated certain actions by prison officials. *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). The Court doubts whether plaintiff could have been said to have had a liberty interest in the standard of proof required by Directive 4421. But that inquiry need not be made because the existence of a due process liberty interest no longer rests solely on the language of prison regulations. As the Supreme Court recently held in *Sandin v. Demont,* —— U.S. ——, 115

S.Ct. 2293, 132 L.Ed.2d 418 (1995), a liberty interest may be created by the State, "[b]ut these interests will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. Variation from the standard of proof in Directive 4421 plainly does not involve freedom from restraint or impose atypical hardship. Plaintiff therefore had no liberty interest in that standard this claim must be rejected.

 Plaintiff next claims that each individual rejection of a piece of legal mail violated his First Amendment rights. Under *Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 1494–96, 52 L.Ed.2d 72 (1977), prisoners are entitled to a reasonable amount of free postage for legal mail as a means of insuring their access to the Courts. *Washington v. James,* 782 F.2d 1134 (2d Cir.1986); *Gittens v. Sullivan,* 848 F.2d 389 (2d Cir. 1988); *Gaines v. Lane,* 790 F.2d 1299 (7th Cir.1986). As a corollary to the right of access, a prisoner has a right to correspond with legal counsel. *Washington,* 782 F.2d at 821, citing *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). Plaintiff claims that Comisse's refusal to advance postage violates the principle in *Bounds.* However, to prevail on a claim of interference with legal mail, a plaintiff must show that a pending or anticipated legal action was prejudiced by the alleged interference. *Berdella v. Delo,* 972 F.2d 204 (8th Cir.1992); *Richardson v. McDonnell,* 841 F.2d 120 (5th cir. 1988); *Morgan v. Montanye,* 516 F.2d 1367 (2d Cir.1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976); *Herrera v. Scully,* 815 F.Supp. 713 (S.D.N.Y.1993). Plaintiff has submitted no evidence that he was prejudiced by DOCS' delay in mailing letters to Miranda Pacheco, Judge Michael A. Telesca, Kenneth Stephens, Nancy Osborn, and Carlos Rodriguez or by its failure to mail the letters to Leslie Jones and Salvadoro Tio. The same is true for plaintiff's claim that his letter to the Malcolm X Legal Foundation was opened outside of his presence, i.e., he has shown no prejudice as a result of the allegedly unauthorized opening. *Morgan,* 516 F.2d at 1371; *Washington,* 782 F.2d at 1139; *Jermosen v.*

*Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y. 1995). Thus plaintiff cannot prevail on the claims of alleged interference with these letters. Plaintiff does allege, however, that he was prejudiced by the refusal to mail the letters to Carmen Pacheco and the Malcolm X Legal Foundation.

 Defendants cannot be liable for refusing to send the letter to Carmen Pacheco because they are entitled to qualified immunity with respect to it. Under *Harlow,* officials are entitled to immunity if, based on the facts known to them at the time of the alleged misconduct, it was objectively reasonable for them to believe that their acts did not violate clearly established constitutional rights. *Gittens v. LeFevre,* 891 F.2d 38 (2d Cir.1989); *Green v. Bauvi,* 46 F.3d 189 (2d Cir.1995). It is undisputed that Carmen Pacheco was not listed as a member of the Bar of the State of New York in the 1992 New York State Lawyer's Diary and Manual, the up-to-date edition at the time plaintiff attempted to send his letter. It is undisputed also that Comisse used the Diary to evaluate whether addressees were lawyers, and that she did so with respect to Carmen Pacheco. It therefore was reasonable for Comisse to conclude, based on Carmen Pacheco's absence from the Diary, that Carmen Pacheco was not an addressee to whom *Bounds'* requirements applied. Indeed, the similarity between plaintiff's name and Carmen Pacheco's makes this conclusion even more reasonable, since Comisse reasonably could have concluded that plaintiff was attempting to mail a personal letter to a relative.

 The Court cannot conclude, however, that the letter to the Malcolm X Legal Foundation was not the sort of legal mail to which *Bounds* applies or that it was reasonable based on the facts known to Comisse and her superiors for them to believe that it was not legal mail. Plaintiff has submitted evidence that the Foundation "provides affordable legal support services" to Muslim prisoners. It is conceivable that such an organization might provide attorneys for ongoing or anticipated litigation; indeed, plaintiff complains that he was prejudiced in his attempt to find a lawyer by defendants' actions. Defendants

have submitted no evidence as to why they concluded that the Malcolm X Legal Research Foundation was not an organization that fell within the meaning of *Bounds*. Summary judgment therefore is not appropriate with respect to this claim.

 Plaintiff challenges also the DOCS policy that prohibits inmates from receiving stamps through the mail. Regulations affecting incoming mail will be upheld if they are reasonably related to an legitimate penological interest. *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The Eighth Circuit in *Kaestel v. Lockhart*, 746 F.2d 1323, 1325 (8th Cir.1984), while applying a more stringent standard than subsequently required by *Thornburgh*, held that a policy prohibiting stamps from being mailed into a facility was constitutional because it was tailored to serve the interest of preventing introduction of stamps into the prison, which might be used by prisoners as a form of currency. As there is no relevant distinction between the policy addressed in *Kaestel* and that followed by DOCS, plaintiff's claim is rejected.

Finally, plaintiff challenges the confiscation of legal papers from a fellow inmate which plaintiff claims were to be used in filing a class action by the inmates in SHU at SCF. Although the papers had plaintiff's name on them, plaintiff does not claim that he owned or otherwise had a direct interest in the papers or that his ability to participate as a member of the purported class was prejudiced. Plaintiff therefore has suffered no injury and does not have standing to challenge the confiscation. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (injury is basis of standing).

### Conclusion

Defendants' motion is granted insofar as the following claims are dismissed: (1) the claims for interference with legal mail, except with respect to alleged interference with plaintiff's letter to the Malcolm X Legal Research Foundation, (2) the claim for alleged confiscation of papers with plaintiff's name on them from another inmate, (3) the chal-

lenge to the DOCS policy prohibiting stamps from being mailed to inmates from outside the prison is granted, and (4) the challenge to DOCS' elimination of the subsidy for non-legal mail. Defendants' motion is denied in all other respects.

SO ORDERED.