**John MANDALA, Plaintiff,**

v.

**Thomas C. COUGHLIN III, Commissioner of the New York Department of Correctional Services; Charles Scully, Superintendent of the Green Haven Correctional Facility; Larry Zwillinger, Health Services Administrator at Green Haven Correctional Facility; Dr. Jeanty, Chief Physician at the Green Haven Correctional Facility; Ms. Stewart, Physician's Assistant at the Green Haven Correctional Facility; Jan Littlefield, Food Service Administrator at the Green Ha-**

ven Correctional Facility; and Sam Roe = "1" through "5" inclusive, said names being fictitious, the true names of said defendants being unknown to plaintiff, the persons intended being Agents, Servants, Officers, and/or employees of the State of New York employed and/or assigned at Green Haven Correctional Facility; All of the above in their individual and/or official capacities, State Defendants,

and

The County of Nassau, Joseph P. Jablonsky, Sheriff of Nassau County; Dr. Kashimawo, Medical Director and Medical Department Administrator at the Nassau County Correctional Center; Sergeant Amitrano, Kitchen Unit Supervising Officer at Nassau County Correctional Center; and John Doe = "1" through "5" inclusive, said names being fictitious, the true names of said defendants being unknown to plaintiff, the persons intended being Agents, Servants, Officers, and/or employees of the County of Nassau, All of the above in their individual and/or official capacities, County Defendants.

No. 94 CV 3560 (ADS).

United States District Court, E.D. New York.

March 16, 1996.

John Mandala, Ossining, New York, pro se.

Dennis Vacco, Attorney General of State of New York by Robert K. Drinan, Assistant Attorney General, Mineola, New York, for State Defendants.

Owen Walsh, County Attorney for County of Nassau by William J. Riccio, Assistant County Attorney, Mineola, New York, for County Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arises out of the claims of the plaintiff, John Mandala, ("Mandala" or the "plaintiff") against the defendants alleging that he received inadequate medical attention and a high fiber diet while incarcerated at the Green Haven Correctional Facility ("GHCF"), a state operated prison, and the Nassau County Correctional Center ("NCCC"). Mandala claims that his civil rights were violated under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, Article I section 5 of the New York Constitution and unidentified "laws of the State of New York [and] the common law." Specifically, he has filed suit against two sets of defendants:

(1) the "State Defendants," who are officers and employees at the GHCF,

 a. Thomas Coughlin III, the Commissioner of the New York State Department of Correctional Services ("Coughlin"),

 b. Charles J. Scully, Superintendent of the Green Haven Correctional Facility ("Scully"),

 c. Larry Zwillinger, Health Services Administrator at the Green Haven Correctional Facility ("Zwillinger"),

 d. Dr. Jeanty, the Chief Physician at the Green Haven Correctional Facility ("Jeanty"), whose given name is not set forth in the parties' motion papers,

 e. Jan Littlefield, the Food Service Administrator at the Green Haven Correctional Facility, ("Littlefield") and

 f. Ms. Stewart, a Physician's Assistant at the Green Haven Correctional Facility, whose given name is not set forth in the parties' motion papers, and

 g. multiple unknown state employees at the Green Haven Correctional Facility ("Sam Roe 1 through 5"); and

(2) the "County Defendants,"

 a. the County of Nassau,

 b. Joseph P. Jablonsky, the Sheriff of Nassau County ("Jablonsky"),

 c. Dr. Kashimawo, the Medical Director and Medical Department Administrator at the Nassau County Correctional Center, whose given name is not set forth in the parties' motion papers,

 d. Sergeant Amitrano, the Kitchen Unit Supervisor at the NCCC, whose given name is also not set forth in the parties' motion papers ("Amitrano"), and

 e. multiple unknown county employees working at the NCCC ("John Doe 1 through 5").

Presently before the Court are motions for summary judgment by both the State Defendants and the County Defendants, pursuant to Fed.R.Civ.P. 56. The defendants contend that even when viewing the facts in the light most favorable to the plaintiff, Mandala is unable to establish a violation of his constitutional rights. In addition, the State Defendants have moved in the alternative, to have their case severed and the venue transferred to the Southern District of New York. In support of these motions, the State Defen-

dants reason that most of the events underlying the plaintiff's claims against them transpired in Duchess County and Mandala is presently incarcerated in Westchester County. Accordingly, it would be logical to hear this case in the Southern District. The plaintiff does not oppose these alternative motions.

## I. *Background*

### A. *Mandala's convictions*

Mandala was convicted of two counts of manslaughter in the first degree in the County Court of Nassau County on January 26, 1989. He was sentenced to consecutive terms of eight and one-third to twenty-five years incarceration and initially placed in the NCCC. On February 27, 1989, the plaintiff was transferred to the state correctional system. After a series of transfers, on January 8, 1991, Mandala was placed in the Green Haven Correctional Facility where he remained until August 4, 1993. The plaintiff alleges that his claims against the State Defendants arose during this two and one-half year period.

On July 19, 1993, the plaintiff's convictions were reversed based on the trial court's failure to disqualify a juror. Mandala was indicted again on August 4, 1993, at which time he was transferred from the GHCF to the NCCC, where he remained incarcerated until October 17, 1994. Mandala alleges that his claims against the County Defendants arose during this one year period.

On September 30, 1994, the plaintiff was again convicted of two counts of manslaughter and was sentenced to consecutive terms of eight and one-third to twenty-five years and three to nine years imprisonment. On October 27, 1994, Mandala was transferred back to the GHCF, where he was incarcerated until approximately September 17, 1995, when he was transferred to the Sing Sing Correctional Facility in Ossining, New York where he is presently incarcerated.

### B. *Mandala's incarceration*

#### 1. *Incarceration at GHCF*

According to the Complaint, on January 1, 1992 at 2:30 p.m., the plaintiff, who was then incarcerated at the GHCF, "requested emergency medical care." Mandala was examined by Stewart, the physician's assistant on duty at the time. The examination revealed that the plaintiff's temperature was elevated, at 101.6. Because no doctors were available to take an x-ray due to the holiday, Stewart suggested that the plaintiff return the next day for further treatment.

Approximately fourteen hours later, on January 2, 1992, at 4:30 a.m., Mandala "experienced sharp excruciating abdominal pains and started to sweat profusely." Although it is not entirely clear, it appears that the plaintiff began screaming to the house officer for help. At 5:15 a.m. an officer entered Mandala's cell to remove him for medical assistance. However, the officer refused to allow the plaintiff to take his winter coat even after Mandala explained that he was "freezing cold, yet sweating at the same time." Further, although the officer brought the plaintiff a wheelchair, Mandala was instructed to either "move the wheelchair [him]self, or walk." As a result, the plaintiff was "forced to limp and walk through the unheated halls with severe pains, chills and without his coat" for thirty minutes in order to obtain medical attention.

Upon reaching the infirmary at 5:45 a.m., the plaintiff was examined by Ms. Ryan, a registered nurse, who took his vital signs. According to the Complaint, Nurse Ryan informed him that "he was dehydrated, had no pulse and that his blood pressure was dangerously low." The nurse then instructed the officer who brought Mandala to the infirmary to get his winter coat. Nurse Ryan was then forced to wheel the plaintiff to a waiting area for an ambulance to take him to the hospital because the officer refused to do so.

The plaintiff arrived at St. Francis Hospital at approximately 7:00 a.m. where he was examined by an emergency room doctor. Subsequently, he was examined by one Dr. Soongh, a surgeon who recommended that surgery be scheduled for the next day. On January 3, 1992, during the preparation for surgery, the hospital staff discovered that the plaintiff's temperature was elevated, at

103.5. X-rays were taken and a diagnosis of pneumonia was made. Antibiotics were prescribed and the surgery took place approximately twenty hours later. A Hartman Procedure and a colostomy were performed.

On January 11, 1992, the plaintiff returned to the GHCF where he was placed in the infirmary and aftercare was ordered along with "colostomy procedures" and a special diet. On February 5, 1992, the plaintiff was returned to St. Francis Hospital and surgical revisals [1] of the colostomy and Hartman Procedure were performed. Mandala then returned to the GHCF infirmary until he was released to rejoin the general population.

On February 22, 1992, the plaintiff was given post-operative instructions and advised to have a high fiber diet. Mandala then informed the kitchen of his medically prescribed diet, but the kitchen staff responded only that he should "go back to medical." Medical informed him that "it was the kitchen's problem."

During the subsequent months, the plaintiff made numerous visits to the medical unit complaining of "severe stomach pain, intestinal burning, strain in defecating and inside stitches coming through the skin." Mandala then had a consultation with one Dr. Jordan who scheduled surgery to remove the stitches and assured the plaintiff that a high fiber diet had been ordered. Nevertheless, the surgery was not performed "until the stitches were piercing the skin."

On April 25, 1992, Mandala made another visit to the medical unit where he spoke with Dr. Jeanty regarding his diet problems. Dr. Jeanty responded only that the matter was a "kitchen problem." On September 24, 1992, Mandala filed a grievance with the Inmate Grievance Resolution Committee at the GHCF regarding the denial of his medically prescribed diet. On September 25, 1992, he wrote a letter to Scully, the Superintendent of the GHCF, concerning the denial of adequate medical care and proper food. The September 25, 1992 letter was forwarded to Zwillinger, the facility's Health Services Administrator for resolution.

On October 13, 1992, the plaintiff was called to a Grievance Committee hearing where it was decided that he should be given the diet prescribed by the medical department consistent with a 1991 court decision, *Milburn v. Coughlin,* 79 CV 5077 (S.D.N.Y. 1991), addressing therapeutic diets at the GHCF. The Grievance Committee's decision was forwarded to Superintendent Scully for implementation.

On October 14, 1992, Mandala wrote a follow up letter to Scully regarding this matter and on October 15, 1992, he received a letter from Zwillinger advising him that the proper diet should be available in the mess hall. Follow up letters were sent to the plaintiff from Scully on October 20, 1992 and Zwillinger on October 26, 1992 regarding the availability of the plaintiff's medically prescribed diet. However, the new diet had not been received as of those dates.

On November 19, 1992, Mandala wrote a letter to Dr. Jeanty complaining that he still was not receiving the proper food. Dr. Jeanty did not respond. On that same day, the plaintiff filed a Notice of Decision of Appeal Form, apparently because Superintendent Scully had failed to take the proper measures pursuant to the Grievance Committee's determination. Scully responded on December 3, 1992 that there was no evidence that the proper diet had been denied.

On January 13, 1993, the plaintiff was contacted by Littlefield, the Food Administrator at the GHCF who informed him that he was aware that the civilian cooks had denied him his medically prescribed diet and that he would personally see that Mandala was provided the proper food. On February 10, 1993, however, the plaintiff spoke with an individual identified in the Complaint as "Sam Roe '2'" who refused to provide him with the medically prescribed diet. Mandala then reiterated his complaint to one Captain Cole. The plaintiff alleges upon information and belief that Captain Cole spoke with Sam Roe 2 and then informed him that there would be no further problems. The plaintiff further alleges however, that Sam Roe 2

1. Although the Complaint refers to surgical "reversals" of the colostomy and Hartman Procedure, the Court assumes the plaintiff means to refer to surgical revisions.

would still on occasion deny him the appropriate food.

Mandala also brought his complaint regarding this incident to Littlefield who told him that he should continue to report any incidents in which he is denied his diet. Mandala alleges that he made such reports "frequently." However, the plaintiff admits in his Rule 3(g) statement that he began receiving the high fiber diet he requested in March 1993, more than one year after his surgery.

### 2. The NCCC incarceration

On July 29, 1993, Mandala was transferred to the NCCC. According to the plaintiff, upon arriving he was processed and his personal property was confiscated. He was then taken to the Medical Department where he was given an evaluation. At this time, Mandala advised the doctor of his ongoing medical condition and treatment regarding his diet and that he required shoulder surgery, which had been previously ordered by the GHCF medical staff. The origin of the shoulder injury is unclear. The doctor informed the plaintiff that a high fiber diet was not available. However, follow up x-rays on the shoulder were taken on July 31, 1993.

"A few days later," Mandala wrote to Jablonsky, the Sheriff of Nassau County informing him of the lack of medical care and submitted a grievance concerning the denial of his high fiber diet and loss of property. On August 9, 1993, Mandala was taken to Nassau County Medical Center for an orthopedic consultation and it was determined that he should try physical therapy for his shoulder before surgery is considered. Approximately three weeks later, Mandala's property was returned and he forwarded the relevant health care documents regarding his diet to the Medical Department.

During this period, the plaintiff alleges that he began suffering from "serious and severe pain" as a result of his improper diet. After signing up for sick call for fifteen consecutive days he was eventually brought to a doctor. At this time, the plaintiff was suffering from "ruptured blood vessels on the sphincter of the anus." Mandala was given some unspecified treatment and advised that the only available diet was a vegetarian diet with extra cereal.

After several more weeks had elapsed, Mandala returned to the Medical Department and complained that he was still not receiving the proper diet or therapy for his shoulder. In response, the plaintiff was informed that there would be no therapy. Nevertheless, over the next several months Mandala continued to make similar complaints.

On February 2, 1994, the plaintiff wrote to the inmate grievance officer complaining that he was not receiving the proper diet. In response, on February 7, 1994, Mandala was advised that the correct diet had been reordered and should be available any day. However, the appropriate food apparently never arrived as the plaintiff continued to make similar complaints on an ongoing basis.

Some time after March 1994, Mandala wrote to one Dr. Levin at the Nassau County Medical Center to suggest surgery because he was still not receiving any therapy. The operation on his shoulder occurred on April 1, 1994.

### C. The Complaint and motions for summary judgment

Mandala filed his Complaint in federal court on August 1, 1994 alleging that his civil rights have been abridged in violation of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, section 5 of the New York Constitution because the defendants' "failure to afford [the] plaintiff adequate medical care." The Court notes that while the Complaint further alleges violation of "the laws of the state of New York, [and] the common law," no related state or common law causes of action are expressly alleged or addressed in the parties' motion papers. Accordingly, these unspecified claims are not considered in this decision.

The State Defendants and the County Defendants filed two separate summary judgment motions. Although the facts underlying Mandala's claims differ somewhat because of the different actors involved at the GHCF and the NCCC, the summary

judgment motions are based on the same argument, namely that even when reading the allegations contained in the Complaint in the light most favorable to the plaintiff, he is still unable to establish that his constitutional rights were violated. The State Defendants move in the alternative to sever the claims against them and to transfer venue to the Southern District of New York. The State Defendants reason that the events underlying the plaintiff's claims against them arose in the Southern District as the GHCF is located in Duchess County and the plaintiff is presently incarcerated in Westchester County. Mandala does not oppose these motions.

## II. *Discussion*

### A. *The summary judgment standard*

A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact," *Terminate Control Corporation v. Horowitz*, 28 F.3d 1335, 1352 (2d Cir.1994) (quoting *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990)), and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(c). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Institute for Shipboard Education v. Cigna Worldwide Insurance Co.*, 22 F.3d 414, 418 (2d Cir.1994); *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990).

Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56(e)); *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *Converse v. General Motors Corp.*, 893 F.2d 513, 514 (2d Cir.1990). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Lane v. New York State Electric & Gas Corp.*, 18 F.3d 172, 176 (2d Cir.1994); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir.1991).

However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Western World*, 922 F.2d at 121. Although the non-moving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment, Fed. R.Civ.P. 56(c) and (e) provide that the non-moving party cannot rest on the pleadings but must set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions on file showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *United States v. Rem*, 38 F.3d 634 (2d Cir.1994).

The Court is also mindful that the plaintiff is proceeding *pro se* and that "the complaint must be 'liberally construed' in favor of the plaintiff[ ] and held to 'less stringent standards than formal pleadings drafted by lawyers'." *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) (per curiam), citing, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972); *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir.1993). The Court recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit his rights by virtue of his lack of legal training. *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). But the Court is also aware that *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Id.*, quoting, *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir.1981). Furthermore, *pro se* litigants are

generally required to inform themselves regarding procedural rules and to comply with them. *Edwards v. INS*, 59 F.3d 5, 8 (2d Cir.1995). This is especially true in civil litigation. *See McNeil v. United States*, —— U.S. ——, 113 S.Ct. 1980, 1984,

124 L.Ed.2d 21 (1993) (suggesting that procedural rules in ordinary civil litigation should not be "interpreted so as to excuse mistakes by those who proceed without counsel"). Moreover, this is not a case where a pro se litigant has stumbled into a snare found only in our case law. *Contrast Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

*LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir.1995).

Finally, when determining a motion for summary judgment, the Court is charged with the function of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994); *Eye Assocs., P.C. v. IncomRx Sys. Ltd. Partnership*, 912 F.2d 23, 27 (2d Cir.1990).

### B. *The validity of Mandala's claims*

Both the State and County Defendants move for summary judgment in their favor dismissing the Complaint, arguing that even when considering the facts alleged in the light most favorable to the plaintiff, Mandala is unable to establish a claim for violations of his civil rights pursuant to the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, section 5 of the New York Constitution. However, before addressing the substance of this argument the Court must first discuss the preliminary issues raised by the State Defendants regarding the liability of defendants Coughlin and Scully both in their individual and official capacities.

#### 1. *Individual liability*

■ Initially, the Court recognizes that "a section 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity." *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989), citing, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 69–70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989); *see also Hafer v. Melo*, 502 U.S. 21, 24, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991) (recognizing that suits against state officials in their official capacity constitute suits against the State, and therefore section 1983 suits for damages can only be maintained against state officials in their individual capacities), citing, *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

■ An individual will not be held vicariously liable under the doctrine of respondeat superior pursuant to section 1983 simply by virtue of that individual having a position of authority. Where "there is no affirmative link between the occurrence of the various incidents of ... [alleged] misconduct and the adoption of any plan or policy ... showing approval of such misconduct" there will be no individual liability. *Rizzo v. Goode*, 423 U.S. 362, 371–81, 96 S.Ct. 598, 604–09, 46 L.Ed.2d 561 (1976). "[S]ome personal responsibility of the defendant is required." *Al–Jundi*, 885 F.2d at 1065, quoting, *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985). Accordingly, if the Commissioner of Corrections is not sufficiently involved in an alleged constitutional violation, he will not be held personally liable for the unlawful activity at issue. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Pacheco v. Comisse*, 897 F.Supp. 671, 678 (N.D.N.Y.1995).

As the Second Circuit recognized in *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986):

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong, .... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event, .... (internal citations omitted)

*See also Al–Jundi,* 885 F.2d at 1066 ("a supervisory official may be personally liable if he or she has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.") (internal quotations omitted); *Pacheco,* 897 F.Supp. at 678.

■ Applying these standards the Court finds that Coughlin cannot be held liable for damages under section 1983 because the plaintiff is unable to establish that Coughlin had any personal responsibility for the events alleged. In his combined memorandum of law-affidavit in opposition to the State Defendants' motion, the only evidence Mandala cites in support of his position with respect to Coughlin are some unspecified letters, grievance processes and the above referenced case in the Southern District of New York regarding dietary problems at the GHCF. *See Milburn v. Coughlin, supra.* However, in reviewing the record, the only letters specifically referenced were to Scully, not Coughlin. Moreover, there is no evidence that Coughlin participated in the grievance processes or that Coughlin knew that there was any violation of *Milburn,* with respect to the plaintiff. Accordingly, because Mandala's contentions fail to demonstrate either participation in the wrong alleged, or a deliberate indifference and failure to act, the State Defendants' motion for summary judgment dismissing the Complaint with respect to Coughlin is granted. *Cf. Al–Jundi.* 885 F.2d at 1065–66 (recognizing that where an individual with authority delegates that authority and does not engage in or authorize the unlawful acts himself, he will not be held liable under section 1983).

■ However, with respect to the defendant Scully, the Court reaches a different conclusion. In his motion papers, Mandala refers to correspondence with Superintendent Scully which tends to establish at least some knowledge of the events complained of and a failure to intercede. For example, on September 25, 1992 and October 14, 1992, Mandala wrote to Scully inquiring as to why he was unable to get his medically proscribed diet. On December 3, 1992, Scully responded that after an investigation of the matter, he found no evidence that Mandala was being denied the proper food. Nevertheless, the plaintiff contends that even after receiving this determination he was still being denied a high fiber diet. The Court finds that these facts, when considered in the light most favorable to the plaintiff, are sufficient to create an issue of fact as to whether Scully was aware of the unlawful activity alleged so as to constitute deliberate indifference to the plaintiff's medical needs. Accordingly, the State Defendants' motion for summary judgment on this ground as to Scully is denied.

### 2. *The substantive claims*

■ Having reached a determination regarding defendants Coughlin and Scully, the Court now turns to the substance of the plaintiff's constitutional claims. Initially, the Court notes, that in bringing this lawsuit, Mandala invokes 42 U.S.C. §§ 1981 and 1983. However, section 1981 covers acts of racial and alienage discrimination. *See generally Yusuf v. Vassar College,* 827 F.Supp. 952, 955–56 (S.D.N.Y.1993); *Howard v. Pine Forge Academy,* 678 F.Supp. 1120, 1124 (E.D.Pa.1987). The plaintiff has not alleged any facts in support of such discrimination. Accordingly, the defendants motion for summary judgment dismissing the plaintiff's section 1981 claims are granted.

■ Further, the Court recognizes that while Mandala has brought his claims regarding inadequate medical care pursuant to the United States and New York State Constitutions, the courts apply the same standards when addressing such claims. *See, e.g., People v. Broadie,* 37 N.Y.2d 100, 110, 371 N.Y.S.2d 471, 474, 332 N.E.2d 338, 340 (1975) (analyzing cruel and unusual punishment claims under the federal and state constitutions together). Accordingly, the Court will address the federal and state constitutional claims in a single analysis.

Having dismissed the plaintiff's section 1981 claims and consolidated Mandala's state and federal causes of action into one analysis, the Court now addresses the substance of those claims. Although the scope of Mandala's claims are not entirely clear from the complaint, which uses language derived from different areas of constitutional law, he does

expressly invoke the Fifth, Eighth and Fourteenth Amendments.

Although the plaintiff does not explicitly mention under which clauses of the amendments he seeks relief, the Court assumes that he invokes his rights to due process and freedom from cruel and unusual punishment. Parenthetically the Court notes that the plaintiff's due process claim might be better brought under the Fourteenth rather than the Fifth Amendment. In any event, given the nature of the claim, a due process claim seems to be the most likely alleged in the Complaint.

### a. *The due process claim*

■ The Supreme Court recently held that in order for a prisoner's due process rights to be implicated, there must be an "atypical, significant deprivation [of rights] in which the state might conceivably create a liberty interest." *Sandin v. Conner*, —— U.S. ——, ——, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995). Such liberty interests are

> generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, *see, e.g., Vitek [v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) ] (transfer to a mental hospital), and *Washington [v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) ] (involuntary administration of psychotropic drugs), nonetheless imposes atypical significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin*, —— U.S. at ——, 115 S.Ct. at 2300.

■ Applying this rigorous standard, the Court finds that the plaintiff is unable to establish a due process violation. The essence of Mandala's claims is that he received inadequate medical care based on the denial of a high fiber diet after his surgery and a denial of proper treatment for his shoulder injury. He does not contend that he was wrongly incarcerated, that his person was unlawfully invaded or that any other "liberty interest" was abridged. Accordingly, the

plaintiff is unable to meet the stringent standard set forth in *Sandin.*

### b. *The cruel and unusual punishment claim*

■ The gravamen of Mandala's claims is that he was denied adequate medical care in violation of the Eighth Amendment which prohibits cruel and unusual punishment. The Eighth Amendment requires that prison officials provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994), quoting, *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984).

In the seminal case of *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court recognized the standard for Eighth Amendment claims based on a failure to provide medical care, requiring that the plaintiff demonstrate a "deliberate indifference to serious. medical needs." The Court elaborated on this standard, stating,

> that deliberate indifference to serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their presence to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104–05, 97 S.Ct. at 291–92 (internal quotations and citations omitted). The *Estelle* Court recognized however that "every claim by a prisoner that he has not received adequate medical treatment [does not] state[ ] a violation of the Eighth Amendment." *Id.* at 105, 97 S.Ct. at 291.

> [I]n the medical context, ... a complaint that physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a

constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege that acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

*Id.* at 106, 97 S.Ct. at 292 (internal quotations and citation omitted); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (recognizing that "more than ordinary lack of due care for [a] prisoner's interest or safety" is required to establish an Eighth Amendment claim). However, the Supreme Court has also recognized that while "deliberate indifference" under *Estelle* requires more than a showing of mere negligence, "something less than [a showing of] acts or omissions for the very purpose of causing harm or with knowledge that harm will result" will suffice. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1978.

The Second Circuit recently recognized the middle ground between these two poles, holding that a prison official does not act with deliberate indifference unless he knows of and disregards " 'excessive risk' to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), quoting, *Farmer,* —— U.S. at ——, 114 S.Ct. at 1979.

■ Analysis of an Eighth Amendment violation requires a two step inquiry. First, the violation alleged must be objectively " 'sufficiently serious.' " *Farmer,* at ——, 114 S.Ct. at 1977, quoting, *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). Second, the prison official charged with the violative conduct must have a " 'sufficiently culpable state of mind.' " *Id.,* quoting, *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992).

Having set forth the standard for "deliberate indifference," the Court now considers what constitutes a "serious medical need." As Judge Pratt recognized in his dissenting opinion in *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting), examples of serious medical needs include a brain tumor, *Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989), delay in removing broken pins in a hip, *Hathaway, supra,* premature return to prison after surgery, *Kelsey v. Ewing,* 652 F.2d 4 (8th Cir. 1981), a bleeding ulcer, *Massey v. Hutto,* 545 F.2d 45 (8th Cir.1976), and loss of an ear, *Williams v. Vincent,* 508 F.2d 541 (2d Cir. 1974). Other examples of serious medical needs include a nurse's refusal to treat a prisoner's surgical wound for five days or provide medication therefor, *Boretti v. Wiscomb,* 930 F.2d 1150, 1154–55 (6th Cir.1991), failure to maintain an adequate policy to test and care for tuberculosis, *DeGidio v. Pung,* 920 F.2d 525, 529–30, 533 (8th Cir.1990), and ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack, *Miltier v. Beorn,* 896 F.2d 848, 852– 53 (4th Cir.1990). Moreover, "while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment [may constitute a] deliberate indifference by prison authorities...." *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977).

Applying these standards, courts have held that denial of a medically required diet may constitute an Eighth Amendment violation. For example, in *Johnson v. Harris,* 479 F.Supp. 333 (S.D.N.Y.1979), the court found that the denial of a medically required diet to a prisoner suffering from diabetes violated his constitutional rights. *See also Ronson v. Commissioner of Correction,* 112 A.D.2d 488, 491 N.Y.S.2d 209, 211 (3d Dep't.1985) (also holding that denial of medically necessary diet to a diabetic constitutes an Eighth Amendment violation); Hon. Charles Richey, Prisoner Litigation in the United States Courts 183 (1995), citing, *Johnson, supra; Cameron v. Thornburgh,* 983 F.2d 253, 255 (D.C.Cir.1993).

Having reviewed the law, the Court now turns to the plaintiff's claims in this case.

*i. Claims against the State Defendants*

■ Applying the law set forth above, the Court finds that the plaintiff has established

questions of material fact regarding the alleged deliberate indifference to his serious medical needs sufficient to defeat the State Defendants' motion. On January 1, 1992, Mandala requested emergency medical care. He was examined by Stewart, a physician's assistant who advised the plaintiff to return the next day when a doctor would be available to take x-rays and prescribe further treatment.

At 4:30 a.m. that night the plaintiff experienced such dramatic pain in his abdomen that he called for the housing officer. At 5:15 a.m. an officer appeared to take Mandala for medical assistance. According to the plaintiff, despite his pleas that he was "freezing cold, yet sweating at the same time," the officer would not let him bring his winter coat. In addition, the officer, though he brought a wheelchair, refused to assist Mandala so that he had "limp and walk through the unheated halls with severe pains, chills and without his coat." Upon reaching the infirmary one half hour later, the plaintiff was examined by Nurse Ryan who instructed that Mandala be taken to the hospital immediately.

On January 3, or January 4, 1992, the plaintiff underwent surgery during which a colostomy and Hartman Procedure were performed. On January 11, 1992, he was returned to the GHCF and placed in the infirmary where aftercare was ordered along with colostomy procedures and a special diet. On February 5, 1992, surgical revisals of the colostomy and Hartman Procedure were performed.

On February 22, 1992, the plaintiff was given post operative instructions and advised regarding the requirements of a special high fiber diet. However, according to the plaintiff, when he advised the kitchen of his medically prescribed diet, he was told that he should "go back to medical." Medical informed him that "it was the kitchen's problem." Throughout the subsequent months, the plaintiff made numerous complaints regarding "severe stomach pains" and "intestinal burning" and that his stitches were "coming through the skin." During a consultation with Dr. Jordan, who scheduled the surgery to remove the stitches, the plaintiff was again advised of the necessity of a high fiber diet and that such a diet had been ordered for him.

Nevertheless, according to the plaintiff, he still was not receiving the medically prescribed diet as of April 25, 1992. As a result, he spoke with Dr. Jeanty, the Chief Physician at the GHCF. Dr. Jeanty responded only that the matter was a "kitchen problem." After several additional months, the diet problem was still not corrected. Consequently, Mandala filed a grievance with the Inmate Grievance Resolution Committee on September 24, 1992. On September 25, 1992, Mandala wrote a letter concerning his ongoing problems to Scully, the GHCF Superintendent. This letter was forwarded to Zwillinger, the GHCF Health Services Administrator. On October 13, 1992, the plaintiff was called into a grievance committee hearing during which it was decided that he should be given the diet he seeks.

On October 14, 1992, Mandala wrote a second letter to Scully. On October 15, 1992, the plaintiff received a response from Zwillinger stating that the proper diet should be available in the mess hall. Nevertheless, the plaintiff alleges that he was still being denied his medically prescribed high fiber diet. Letters were sent to the plaintiff from Scully on October 20, 1992, and Zwillinger on October 26, 1992 regarding his diet, which was still unavailable. On November 19, 1992, Mandala wrote another letter complaining to Dr. Jeanty. Subsequently, Mandala filed a Notice of Decision of Appeal, apparently because Scully failed to take the proper measures pursuant to the grievance committee's decision to afford Mandala the medically prescribed diet. Scully issued a decision on December 3, 1992 in which he determined that the plaintiff had not been denied the proper food.

On January 13, 1993, a year after the original surgery, the plaintiff was contacted by Littlefield, the GHCF food service administrator who advised him that he would receive the proper diet. Nevertheless, on February 10, 1993, the plaintiff's dietary requests were still being denied.

The Court notes that as a preliminary matter, Stewart's asking Mandala to return the next day during his January 1, 1992 visit to the infirmary would not rise to a constitutional violation. Rather, it may constitute medical malpractice which does not give rise to a federal claim. However, the subsequent events do form the basis for a constitutional cause of action.

According to the plaintiff, despite his pleas, while in excruciating pain, he was not permitted to wear his winter coat to the infirmary and he was forced to spend thirty minutes limping to get there. These allegations if true may demonstrate a deliberate indifference to the plaintiff's medical needs. While the defendants may be able to argue that the officer could not have realized the serious nature of the plaintiff's medical problems at the time, and this episode alone may not give rise to a constitutional cause of action, the totality of the circumstances must be considered.

After being examined at the infirmary, the plaintiff was sent to the hospital where he underwent a colostomy and Hartman Procedure. After the surgery was completed, Mandala was advised on several occasions that he would need a special high fiber diet in order to heal properly. This diet was required with regard to a serious medical condition. Yet despite his repeatedly relaying this information to both the GHCF kitchen and medical staff, he was denied such a diet. Even after making numerous complaints over the course of a year, and the decision of the Inmate Grievance Resolution Committee granting the plaintiff the diet he seeks, Mandala did not receive a high fiber diet. The State Defendants characterize the plaintiffs claims as a request "that the food [he receives] be tasty or attractive" as opposed to "nutritionally adequate," the latter being all they are obligated to provide. The Court disagrees.

The plaintiff was not seeking a modified diet as the result of a peptic ulcer, *see Martinez v. Griffin*, 840 F.2d 314 (5th Cir.1988) or a migraine headache. *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir.1987). Rather, he sought a medically required diet following major abdominal surgery including a colostomy. As the court found in *Johnson*, 479 F.Supp. at 337, after the plaintiff made repeated attempts to obtain a medically necessary diet, Mandala "is challenging a pattern of conduct, that seemingly amounts to a policy, whereby prison officials have consciously ignored the special dietary requirements of one ... inmate and have resolved, either consciously or through calculated indifference, to continue to ignore his special medical needs."

As stated above, Mandala had major surgery after which the treating physicians advised him that he would need a special diet to heal properly. Yet despite continuous efforts to obtain the proper diet, the plaintiff's efforts were thwarted for more than a year. The Court finds that these allegations, when taken in the light most favorable to the plaintiff, are sufficient to create a material issue of triable fact as to whether the defendants violated Mandala's Eighth Amendment rights. Accordingly, the State Defendants' motion for summary judgment dismissing this claim, is denied.

### ii. *Claims against the County Defendants*

██ On July 29, 1993, the plaintiff was transferred to the NCCC. Upon arriving, he informed the medical staff of his dietary needs and that he needed shoulder surgery. "A few days later," he wrote to Jablonsky complaining that he was not getting the proper medical attention. On August 9, 1993, Mandala was taken for an orthopedic consultation at the Nassau County Medical Center where he was advised to be treated conservatively by physical therapy in lieu of shoulder surgery.

At this time, the plaintiff began suffering from "serious and severe pain" including "ruptured blood vessels on the sphincter and anus," problems that could be associated with his colostomy and the lack of a special diet. He was given some treatment and advised that the only special diet he could be given was cereal and vegetables.

Several weeks later, Mandala returned to the medical department complaining that he was not receiving any physical therapy or the proper diet. On February 2, 1994, the plaintiff wrote to the inmate grievance committee

regarding his diet. In response, on February 7, 1994, he was informed that the proper food had been ordered and would be available any day. Apparently, the proper diet never arrived because Mandala continued to make complaints. Some time after March 1994, the plaintiff wrote to Dr. Levin requesting surgery because he was not getting the recommended physical therapy. The operation occurred on April 1, 1994.

The County Defendants moved for summary judgement contending that the plaintiff had not been denied "any of his requests for medical treatment or for his special diet." To the extent that Mandala did not receive his diet on a limited number of occasions, the County Defendants contend it was the result of "inadvertence and did not rise to the level of deliberate indifference as is required to state a constitutional claim." Further, the County Defendants contend that "the record shows" that they looked after the plaintiff's shoulder problems from the moment he arrived, culminating in his having surgery.

According to Mandala, from the moment he arrived at the NCCC he advised the County Defendants of his ongoing medical needs regarding his diet and shoulder. While the claims regarding his physical therapy seem inconsequential, sounding more in negligence than a constitutional violation, the Court reiterates its concern regarding the plaintiff's medically required dietary needs. Although the County Defendants contend that they have met Mandala's dietary needs, the Court finds that this dispute constitutes a question of material fact sufficient to deny the County Defendants' motion for summary judgment.

#### C. *The motion to change venue*

 The State Defendants have moved in the alternative to have the case against them severed and transferred to the Southern District of New York because all of the events relating to the relevant claims occurred at the GHCF in Duchess County. Further the plaintiff has been transferred to the Sing Sing Correctional Facility in Westchester. While the plaintiff does not oppose these motions, the County Defendants have taken no position with regard to the transfer.

The State Defendants' motions to sever and transfer venue are denied. Given the related nature of the plaintiff's complaints against both sets of defendants, the Court sees no reason to waste judicial resources by trying two similar cases separately, before two courts. However, if all parties consent to a transfer of venue because the plaintiff is now incarcerated in Westchester County, would be more readily available in Court in that area, and the parties' establish proper jurisdiction over the County Defendants in the Southern District of New York, the Court will reconsider this decision.

#### III. *Conclusion*

After reviewing the parties submissions, and for the reasons set forth above, it is hereby

ORDERED, that the State Defendants' motion for summary judgment pursuant Fed. R.Civ.P. 56 dismissing the Complaint as to defendant Coughlin is granted; it is further

ORDERED that the State Defendants' motion for summary judgment pursuant Fed. R.Civ.P. 56 dismissing the Complaint as to defendant Scully is denied; it is further

ORDERED, that the defendants' motions for summary judgment dismissing the Complaint pursuant to Fed.R.Civ.P. 56 are granted with regard to the plaintiff's claims brought pursuant to 42 U.S.C. § 1981 and to the extent that he seeks relief pursuant to his due process rights; it is further

ORDERED, that the defendants' motions for summary judgment dismissing the Complaint pursuant to Fed.R.Civ.P. 56 are denied with regard to the plaintiff's claims pursuant to 42 U.S.C. § 1983 and the Eighth Amendment and related New York Constitutional protections against cruel and unusual punishment; and it is further

ORDERED, that the State Defendants' motions to sever the claims against them and transfer venue are denied.

SO ORDERED.