**Al–Amin ABDUSH–SHAHID f/k/a Anthony Cook, Plaintiff,**

**v.**

**Thomas A. COUGHLIN, III, Commissioner; Phillip Coombe, Jr., First Deputy Commissioner; Robert B. Greifinger, M.D., Deputy Commissioner; Louis F. Mann, Superintendent; Raymond J. Cunningham, Captain; Jay Squillace,**

**Food Service Manager; A. Degaust, Lieutenant; J. Recht, Medical Doctor; B. ALLYN, Medical Doctor; Cathy Vacca, Nurse Administrator; C. Salavac, X–Ray Technician; Mary Kurta, Registered Nurse, Defendants.**

No. 91–CV–1110.

United States District Court, N.D. New York.

June 24, 1996.

Al–Amin Abdush–Shahid, Wallkill, NY, Pro Se.

Judith Ratner, Assistant Attorney General, Office of Attorney General, State of New

York, Department of Law, Albany, NY, for Defendants.

## OPINION AND ORDER

KOELTL, District Judge [1]:

The plaintiff Al–Amin Abdush–Shahid (formerly known as Anthony Cook), an inmate currently incarcerated at Shawangunk Correctional Facility, brought this action pursuant to 42 U.S.C. § 1983 against former and current prison officials, including doctors and other medical personnel, in both their individual and official capacities. The plaintiff alleges that he was denied proper medical treatment in violation of his federal constitutional rights under the Fifth, Eighth, and Fourteenth Amendments. In addition, the plaintiff contends his Fourth Amendment rights were violated because the defendants released his medical records without his consent. Currently before the Court is the defendants' motion for summary judgment dismissing the plaintiff's entire complaint.

The plaintiff alleges that the defendants unconstitutionally deprived him of necessary medical care by removing him from a medically prescribed soft-food diet without a proper medical order and by delaying elective surgery to remove a small growth in his salivary gland for almost three years, thereby subjecting him to an unreasonable and unnecessary amount of physical pain and mental anguish.

The defendants claim that they are entitled to summary judgment on various grounds, including the plaintiff's failure to present evidence that the defendants were deliberately indifferent to a serious medical condition or that the supervisory defendants were personally involved in the alleged constitutional violation. The defendants also assert that in any event they are entitled to qualified immunity.

## I.

The following factual summary is based on the affidavits, the defendants' Local Rule 10(j) statement relating to the motion, and exhibits submitted in connection with the motion. The facts are basically undisputed and are construed in the light most favorable to the plaintiff as the nonmoving party on this motion for summary judgment.

The plaintiff first complained about a lump in his neck above his Adam's apple on October 22, 1990. On that day, he went to the medical clinic at Shawangunk Correctional Facility and was referred to defendant Dr. Recht ("Recht") for evaluation. On October 24, 1990, Recht examined the plaintiff and x-rayed his neck. (Defs.' 10(j) ¶¶ 1–2; Vacca Aff. ¶¶ 2, 3; Cook Aff. ¶¶ 4, 5.)

The plaintiff claims that at this first appointment he was told he would be called back for a follow-up appointment if the x-ray revealed any abnormality but that no one ever called him about the results of his x-ray. Instead, the plaintiff alleges, he did not learn that the x-ray revealed a glandstone in his salivary gland until he returned to the medical clinic over a month later on December 4, 1990. (Cook Aff. ¶¶ 6, 7.) On that day, defendant Dr. Allyn ("Allyn") told the plaintiff that the x-ray showed an eight-millimeter calculus submandibular, a small stone located in the plaintiff's left salivary gland, and referred him to the Ear, Nose, and Throat (ENT) Clinic. Allyn also placed the defendant on a soft-food diet and gave him pain medication. (Defs.' 10(j) ¶ 3; Vacca Aff. ¶ 4; Cook Aff. ¶ 8.) The following day, the plaintiff, who complained that he was having difficulty with the soft diet, was placed on a full liquid diet. (Defs.' 10(j) ¶ 4; Vacca Aff. ¶ 5.) The ENT specialist, Dr. Stein ("Stein"), saw the plaintiff on December 8, 1990 and ordered a CAT scan of the area where the growth was detected. (Defs.' 10(j) ¶ 5; Vacca Aff. ¶ 6; Cook Aff. ¶ 10.) The plaintiff was also placed back on a full regular diet. (Defs.' 10(j) ¶ 6; Vacca Aff. ¶ 6.)

On January 4, 1991, the plaintiff requested emergency sick call, claiming that he was spitting up blood clots and had difficulty swallowing food. He was again placed on a full soft diet with a supplement. A second x-ray was taken to determine whether the

1. Hon. John G. Koeltl of the United States District Court for the Southern District of New York sitting by designation.

growth had increased in size. The film showed that the growth was the same size as it was on October 24, 1990. (Defs.' 10(j) ¶ 5; Vacca Aff. ¶ 6.) A CAT scan performed on January 21, 1991 at Horton Memorial Hospital in Middletown, New York again revealed a growth in the plaintiff's submandibular region. (Defs.' 10(j) ¶ 7; Vacca Aff. ¶ 8; Cook Aff. ¶ 11.) The plaintiff was scheduled to see Stein at the ENT Clinic on February 9, 1991. The plaintiff alleges that defendant Nurse Administrator Vacca ("Vacca") should have sent Stein both the written report of the CAT scan and the actual film itself, but because she only sent the written report, Stein was unable to determine whether he would have to operate extra-orally or intra-orally to remove the growth. (Cook Aff. ¶ 12.) The defendants claim that Stein asked for the actual film only after he saw the plaintiff on February 9. (Defs.' 10(j) ¶ 8; Vacca Aff. ¶ 9.) Stein planned to look at the CAT scan films on the plaintiff's next clinic visit, rescheduled for March 9, 1991, but this appointment was cancelled. (Defs.' 10(j) ¶ 8; Vacca Aff. ¶ 9; Cook Aff. ¶ 13.) The defendants claim that Stein could not keep the appointment because he had to attend to an emergency. (Defs.' 10(j) ¶ 8; Vacca Aff. ¶ 9.)

On March 17, 1991, the plaintiff complained of a persistent pain in his neck. The plaintiff told medical personnel he was not taking pain medication because he was fasting. (Defs.' 10(j) ¶ 9; Vacca Aff. ¶¶ 10, 11; Cook Aff. ¶ 14.) The defendant claims that he is a Muslim who was obligated to fast during the Month of Ramadan. (Cook Aff. ¶ 14.)

The plaintiff again saw Stein on April 6, 1991. Stein recommended that an intra-oral excision of the plaintiff's submandibular stone be scheduled. (Defs.'s 10(j) ¶ 11; Vacca Aff. ¶¶ 10, 11; Cook Aff. ¶ 15.)

On April 26, 1991, the plaintiff was taken off his medically prescribed soft diet. (Defs.' 10(j) ¶ 12; Vacca Aff. ¶ 4; Cook Aff. ¶ 18.) The defendants allege that this occurred because the plaintiff had abused his special diet privileges from April 22 to April 26 by accepting his meals but not eating them. (Defs.' 10(j) ¶ 12; Vacca Aff. ¶ 4.) He accepted but did not eat 12 of 14 meals from April 22 to April 26. (Squillace Aff. ¶ 4; Defs.' 10(j) ¶ 13.) In a memo to Vacca, defendant Squillace, the Food Services Manager, recommended that Allyn remove the plaintiff from the special diet program, and Allyn ordered it done. (Defs.' 10(j) ¶ 13; Compl., Exh. D.) While the plaintiff does not dispute he did not eat the special meals, he contends that he did not eat them because they were "unfit for human consumption." (Compl., Exh. E.) On May 3, 1991, the plaintiff went to the medical clinic claiming that he had not eaten in 8 days. He refused to be weighed or to have his vital signs monitored, however. (Defs.' 10(j) ¶ 14; Vacca Aff. ¶ 13; Ratner Aff., Exh. A (5/3/91 Ambulatory Health Record).)

In a letter dated April 26, 1991 to defendant L.F. Mann, the superintendent of Shawangunk, the plaintiff complained that he had been improperly taken off his therapeutic diet and that he had been waiting eight months for the removal of a salivary glandstone. (Compl., Exh. E.) The deputy superintendent defendant Cunningham, who responded to the plaintiff by letter on May 13, 1991, stated that he had investigated the plaintiff's complaints against both the food service and medical departments, and that he had learned that the plaintiff was not cooperating with the medical staff and that there was no information to support the plaintiff's complaints. (Compl., Exh. C.)

On May 22, 1991, the Medical Department at Shawangunk referred the plaintiff to the Dental Department to schedule an appointment with an oral surgeon to evaluate the plaintiff's glandstone. Dr. Clayton Hise ("Hise") examined the plaintiff and determined that he had an 8 millimeter by 10 millimeter opacification in the body of the left submandibular gland, the same size as previous examinations had indicated. (Defs.' 10(j) ¶ 15; Russ Aff. ¶ 2; Cook Aff. ¶ 22.) Hise discussed with the plaintiff the possible treatments for this condition, which included no further treatment or surgical excision of the left submandibular gland. (Defs.' 10(j) ¶ 15; Russ Aff. ¶ 2.) Although Hise told the plaintiff that surgical excision of the growth involved a possibility of permanent damage to the lingual or hypoglossal nerves, the

plaintiff told the doctor he wanted to have the surgery. (Defs.' 10(j) ¶ 15; Cook Aff. ¶ 22.)

In late April 1991, the plaintiff had complained to defendant Phillip Coombe, Jr., First Deputy Commissioner, that he was not receiving his medically prescribed soft-food diet and that surgery to remove his salivary glandstone had not yet been performed. By letter dated May 29, 1991, Coombe responded through his deputy Robert Greifinger that he had found no basis for the plaintiff's complaint. (Compl., Exhs. G, H.) Greifinger's letter to the plaintiff stated that "the health staff is aware of your concerns and it appears that you are being appropriately cared for." (Compl., Exh. H.) Greifinger noted that the plaintiff's surgery had been rescheduled due to a required court appearance, and he assured the plaintiff that he "should receive the surgery in the near future." (Id.) In addition, Greifinger stated that he had learned the plaintiff's diet had been discontinued because he was not eating his special meals. (Id.)

On June 4, 1991, the plaintiff wrote another letter to defendant Greifinger because the plaintiff believed that Greifinger was "misinformed." (Compl., Exh. J.) This letter stated that the plaintiff had not eaten his special meals because they were not fit for human consumption and suggested that Greifinger did not understand the real reasons that his surgery had been delayed. (Id.) On June 27, 1991, Greifinger informed the plaintiff that the Division of Health Services and the Health Care staff had investigated his complaints; that he learned the diet was discontinued because the plaintiff was non-compliant, and that the discontinuance had no side effects; and that Stein had been evaluating the plaintiff's condition on an on-going basis and an appointment had been scheduled in the near future. (Compl., Exh. L.) On June 4, 1991, the plaintiff also filed a grievance concerning the delay in treatment. Defendant Mann responded that the delays "were not under the medical units [sic] control" and that surgery was scheduled. (Cook Aff., Exh. A.)

Stein was scheduled to perform the surgery on June 26, 1991 at Butterfield Hospital. Pre-operative bloodwork was done on June 21, 1991, and on June 25, 1991, another x-ray was taken to reevaluate the size and position of the stone, which remained unchanged since the first x-ray taken on October 24, 1990. (Defs.' 10(j) ¶ 17; Vacca Aff. ¶¶ 15, 30; Russ Aff. ¶ 3; Cook Aff. ¶ 19.) Stein was unable to operate that day because the plaintiff's CAT scan films had not been sent to the hospital. (Defs.' 10(j) ¶ 18; Vacca Aff. ¶ 16; Cook Aff. ¶ 19.) The plaintiff alleges that defendants Vacca, Recht, and Allyn were responsible for sending the CAT scan films. (Cook Aff. ¶ 19.) On July 1, 1991, the plaintiff informed defendant Greifinger that his surgery had been postponed because the medical staff had failed to send the CAT scan films to the hospital. (Compl., Exh. M.) On the same day, the plaintiff also complained in writing to defendant Mann, stating that the "gross negligence" of the medical staff had caused his surgery to be delayed for ten months. (Compl., Exh. M.)

The plaintiff's operation was rescheduled with Hise on July 26, 1991 at Vassar Brothers Hospital. The surgery was again cancelled, however, because the plaintiff's blood analysis indicated that he had elevated liver enzymes, and the anesthesiologist refused to administer anesthesia under such circumstances. (Defs.' 10(j) ¶ 19–20; Cook Aff. ¶ 23.) The defendants claim that it is likely that the surgery would not have been performed on June 26, 1991 for the same reason. (Defs.' 10(j) ¶ 20; Russ Aff. ¶ 5.)

The defendants claim, and the plaintiff does not contest, that when an anesthesiologist overrides a surgeon's determination that a patient is fit for surgery, an internist must do a history and physical of the patient and give clearance for surgery. On August 12, 1991, Dr. Russ ("Russ") spoke to Hines, Assistant Commissioner of Health Services, who stated that an internist with privileges at Vassar Hospital must clear plaintiff in order for him (Hise) to perform the surgery. Hise spoke to a number of internists but none was willing to take on the case. Russ then advised Dr. Devane ("Devane"), the Acting Director of Dental Services, of the problems he had encountered obtaining a surgeon to perform the plaintiff's surgery.

Devane consulted with Hines, who, after reviewing plaintiff's medical records, scheduled an appointment for the plaintiff to be seen at Upstate Medical Center on September 18, 1991 for surgical evaluation. (Defs.' 10(j) at ¶¶ 21–22; Russ Aff. ¶¶ 6, 7; Cook Aff. ¶ 24.)

Some time before August 16, 1991, the plaintiff wrote to defendant Coughlin to complain about the medical treatment he had received at Shawangunk. Coughlin responded in a letter dated August 16, 1991 that an investigation into the plaintiff's complaints revealed that surgery to removal his glandstone had been postponed because of problems with his bloodwork, that new bloodwork had been performed, and that if the results were normal, the plaintiff would be rescheduled for surgery. (Cook Aff., Exh. A.)

The plaintiff's surgery was rescheduled for September 18, 1991. (Russ Aff. ¶¶ 6, 7.) On September 12, 1991, the plaintiff was transferred to Auburn Correctional Facility where he was housed while being treated at the SUNY/Upstate Medical Center. (Defs.' 10(j) ¶ 23; Cook Aff. ¶ 25.) On September 18, 1991, he was examined at SUNY/Upstate Medical Center, but his surgery was once again cancelled because his bloodwork indicated abnormal liver enzymes. (Defs.' 10(j) ¶ 23; Russ Aff. ¶ 8; Vacca Aff. ¶ 20; Cook Aff. ¶ 26.) Blood work was to be done on the plaintiff while in prison at Auburn, and follow-up appointments were scheduled with the Medical and ENT clinics at Upstate for October 10 and 11, 1991. However, on September 23, 1991, the plaintiff refused to permit the bloodwork to be done at Auburn. (Defs.' 10(j) ¶ 23; Russ Aff. ¶ 8; Vacca Aff. ¶ 20; Ratner Aff., Exh. A (9/23/91 Refusal of Medical Exam. and/or Treatment form).) The plaintiff was then returned to Shawangunk on September 25, 1991. (Defs.' 10(j) ¶ 24.)

The bloodwork the Upstate clinic ordered was performed at Shawangunk on September 27, 1991. (Defs.' 10(j) ¶ 25; Russ Aff. ¶ 10; Vacca Aff. ¶ 21; Ratner Aff., Exh. A (9/27/91 Ambulatory Health Record).) The plaintiff was told he was on administrative hold awaiting a trip back to Auburn and the Upstate Medical Center, where he would be examined by an internist and his surgery would be rescheduled. The plaintiff never made this trip. The defendants allege that this trip was cancelled because the plaintiff refused to be housed at Auburn, citing security concerns. (Defs.' 10(j) ¶ 25; Russ Aff. ¶ 9; Cook Aff. ¶ 28.) In a memorandum dated September 27, 1991 from the plaintiff to Louis Mann, the superintendent of Shawangunk, the plaintiff affirmed that he disallowed the Facility Health Director at Auburn from rendering medical attention to him "under any circumstances" and that

> [m]edical attention like that which I received in Auburn, I do not need or want. Additionally, I stand by my writing(s) with respects to the medical staff at Auburn Correctional Facility and them being able to treat me.

(Cook Aff., Exh. A.)

The defendants then made efforts to accommodate the plaintiff's apparent refusal to travel to Auburn. On October 10, 1991, Russ alerted Dr. Robert McArdle ("McArdle"), Director of Dental Services, of the plaintiff's situation. McArdle suggested that a local surgeon, Dr. Tse ("Tse"), review the case. On October 18, after reviewing the plaintiff's medical history, radiographs, and case history, Tse informed Russ that he was not interested in the case. (Defs.' 10(j) ¶ 26.) On October 22, 1991, Russ spoke to a representative of Medicus, an HMO, about whether Medicus had an internist who had privileges at Vassar Hospital who could clear the plaintiff for surgery, and learned that Medicus did not. On October 28, Vacca told Russ that Dr. Chandler ("Chandler"), an internist at Green Haven Correctional Facility, had privileges at Vassar. (Defs.' 10(j) ¶ 27; Russ Aff. ¶ 12; Vacca Aff. ¶ 22.)

Meanwhile, the plaintiff was seen by prison medical personnel many times during the month of October 1991. He was placed on a dental soft diet on October 8, and he was prescribed pain mediation on several occasions. At times slight swelling on the side of his neck and tenderness at the submandibular site were noted. (Ratner Aff., Exh. A (10/2/91–10/30/91 Ambulatory Health Records).) The plaintiff also sent letters complaining about his medical treatment to defendant Coughlin. In a letter dated No-

vember 6, 1991, Coughlin stated that the Division of Health Services had investigated the plaintiff's medical treatment and informed Coughlin that abnormal bloodwork and the plaintiff's lack of cooperation delayed the surgery. Coughlin concluded that "every effort has been made to address your health concerns." (Cook Aff., Exh. A.)

On November 8, 1991, Chandler saw the plaintiff at Green Haven for a pre-operative history and physical. Although Chandler cleared the plaintiff for surgery, the plaintiff allegedly called Chandler an idiot. The plaintiff sent Russ and Sheridan letters stating that he wanted a second opinion because he did not want anesthesia administered improperly. Russ told the plaintiff that it was up to him whether he wanted to have the surgery. (Defs.' 10(j) ¶ 28; Cook Aff., Exh. A. (11/19/91 Letter from Cook to Sheridan); Cook Aff., Exh. A (11/8/91 Letter from Cook to Russ).)

The plaintiff was not present at the Shawangunk facility from December 4, 1991 to December 17, 1991 because of a court appearance and was thus unavailable for treatment during this time period. (Defs.' 10(j) ¶ 29; Vacca Aff. ¶ 24; Cook Aff. ¶ 31.) On December 18, 1991, the plaintiff requested pain medication because his medicine order had expired while he was out of the facility. The plaintiff refused the Extra Strength Tylenol that was offered to him, and was scheduled for a medical renewal evaluation by Allyn on December 26, 1991. (Defs.' 10(j) ¶ 29.) On December 22, the plaintiff requested emergency sick call, complaining of pain and swelling in his neck and stating that Extra Strength Tylenol was not effective for relief of his pain. No obvious swelling was noted, but the submandibular site was tender to the touch. Defendant Recht, who was contacted by phone, prescribed Anaprox. On December 26, defendant Allyn renewed the plaintiff's Anaprox prescription. (Defs. 10(j) ¶ 30; Vacca Aff. ¶¶ 24–25; Ratner Aff., Exh. A (12/17/91–12/26/91 Ambulatory Health Records).)

On December 20, 1991, the plaintiff went to the Dental Department and asked that Russ reschedule the surgery. Russ spoke to Hise, who stated that he would schedule the surgery, but it would require two oral surgeons and could not take place until sometime in February. (Defs.' 10(j) ¶ 31; Russ Aff. ¶ 14.)

The surgery could not be performed from February 3, 1992 to March 26, 1992 when the plaintiff was again out of the facility for a court appearance. (Defs.' 10(j) ¶ 32; Russ Aff. ¶ 15; Vacca Aff. ¶ 26.) During this period, while in custody of the New York City Department of Corrections, the plaintiff refused any treatment for his submandibular glandstone, stating that he wanted to wait until he returned to Shawangunk. (Defs.' 10(j) ¶ 32; Ratner Aff., Exh. B (Medical Records from Rikers Island at 4).) A general examination of the plaintiff revealed tenderness and mild swelling of the plaintiff's submandibular gland. (Ratner Aff., Exh. B (Medical Records from Rikers Island at 4).) The plaintiff was placed on a soft diet. (Id.)

When the plaintiff returned to Shawangunk at the end of March, he made various complaints about an injury he allegedly suffered from an assault by officers at Rikers Island. An examination conducted on March 26, 1992 revealed no visible signs of injury. (Defs.' 10(j) ¶ 33; Vacca Aff. ¶ 26; Ratner Aff., Exh. A (3/26/92 Ambulatory Health Record).)

On April 7, 1992, the plaintiff went to the medical clinic but refused to divulge the nature of his complaint other than a vague description of a growth in his throat. On April 25, 1992, the plaintiff returned to the medical clinic complaining of an injury to his ribs and a chronic problem with his throat. An examination revealed no problems. The plaintiff was then scheduled to see a doctor on May 5 to discuss his problems further. (Defs.' 10(j) ¶ 34; Vacca Aff. ¶ 27; Ratner Aff., Exh. A (4/7/92, 4/25/92 Ambulatory Health Records).)

The plaintiff's May 5 appointment was rescheduled to May 12 due to a facility-wide lockdown. On May 7, 1992, the plaintiff requested one cup of ice for his neck, which the kitchen provided at each meal. The plaintiff was examined on May 12, and it was noted that the pain in the plaintiff's submandibular gland was persisting. On May 16, 1992, the

plaintiff requested emergency sick call and complained of increased swelling and pain in his neck. The plaintiff was given an ice pack and a follow-up appointment with defendant Recht was scheduled for May 18. At that time, defendant Recht ordered an x-ray of the plaintiff's submaxillary gland to determine whether there had been any change since June 25, 1991. The doctor noted that there was inflammation at the site of the stone and a hard nodule was very palpable. (Defs.' 10(j) ¶ 36; Vacca Aff. ¶¶ 28–29; Ratner Aff., Exh. A (4/28/92, 5/7/92, 5/12/92, 5/16/92 Ambulatory Health Records).)

On May 20, 1992, the plaintiff again requested emergency sick call, complaining of pain in his mouth. He wanted the x-ray that Recht had ordered taken. He refused ice an officer offered to him, and stated, "They are not qualified to give me my meds." The x-ray was taken and revealed no change in the size or position of the growth in his gland since October 24, 1990. (Defs.' 10(j) ¶ 37; Vacca Aff. ¶ 30; Ratner Aff., Exh. A (5/20/92 Ambulatory Health Record).)

The plaintiff was again out of the Shawangunk facility and not in state custody for court appearances from May 21, 1992 to July 3, 1992, and thus was unavailable for treatment during that time. (Russ Aff. ¶ 15; Vacca Aff. ¶ 31.) While housed at the Montefiore Medical Center (Rikers Island Health Services) from May 29, 1992 to July 1, 1992, the plaintiff was placed on a soft diet with liquid supplements. The plaintiff refused to eat and appeared to be on a hunger strike. He consistently refused medical care and asked medical personnel to stay away from him, stating that there was nothing wrong with him, and specifically refused surgical intervention with respect to his submandibular stone. The plaintiff refused to sign medical refusal forms despite many requests to do so. (Defs.' 10(j) ¶ 38; Ratner Aff., Exh. C.)

On July 3, 1992, the day that the plaintiff returned to Shawangunk, defendant Recht ordered an ENT consultation and an x-ray of the plaintiff's neck and throat. The x-ray results of July 7 showed that there had been no change in the size, position, or appearance of the plaintiff's salivary glandstone since October 24, 1990. (Defs.' 10(j) ¶ 39; Russ

Aff. ¶ 15; Vacca Aff. ¶ 31; Ratner Aff., Exh. A (7/7/92 X–Ray Requisition and Report).)

On July 13, 1992, defendant Recht renewed an order for Ecotrin and ice for the plaintiff. On July 17, the plaintiff complained that the Ecotrin and ice were not helping and requested an appointment with Russ in the dental clinic. A dental appointment was made. (Defs.' 10(j) ¶ 40; Vacca Aff. ¶ 32.) The plaintiff was on a soft diet and was eating in the diet mess hall. (Ratner Aff., Exh. A (7/28/92 Ambulatory Health Report).)

On August 3, 1992, the plaintiff was examined at St. Agnes Hospital. The consultant noted the plaintiff's submandibular gland was minimally tender to the touch. In addition, the consultant recommended that the plaintiff's liver enzymes be checked, that the plaintiff be sent to an internist if the enzymes were elevated, that an appointment be made with the medical clinic for surgical clearance, and that the excision of the submandibular gland be scheduled if the plaintiff was cleared for surgery. (Defs.' 10(j) ¶ 42; Vacca Aff. ¶ 34; Russ Aff. ¶ 16; Ratner Aff., Exh. A (8/3/92 Request and Report of Consultation).)

A consultation with the medical clinic at St. Agnes was scheduled for August 27, 1992 to attempt to get clearance for plaintiff's surgery. The plaintiff refused the trip to St. Agnes and refused to go to the facility clinic so that a nurse could explain the consequences of his refusal. (Defs.' 10(j) ¶ 43; Vacca Aff. ¶ 35; Russ Aff. ¶ 17; Ratner Aff., Exh. A (8/27/92 Request and Report of Consultation).) Another x-ray of the plaintiff's neck was taken on September 3, 1992, and it revealed that the stone was the same size as it had been on October 24, 1990. (Defs.' 10(j) ¶ 44.)

The plaintiff was again out of the facility and not in state custody for a court appearance for six months, from September 4, 1992 to March 4, 1993. (Defs.' 10(j) ¶ 45.) On March 25, 1993, the plaintiff requested a bland, soft diet. Defendant Recht examined the plaintiff on April 8, 1993 and ordered a bland diet and Tagamet for his stomach

pains. (Defs.' 10(j) ¶ 46; Vacca Aff. ¶¶ 37–38.)

On April 29, 1993, the plaintiff's bloodwork was sent to the lab. On May 4, the plaintiff was seen at the St. Agnes Hospital ENT Clinic to be scheduled for excision of the left submandibular gland. On May 19, the plaintiff refused to sign the necessary forms for the renewal of his soft diet. (Defs. 10(j) ¶ 47–48; Vacca Aff. ¶ 39; Russ Aff. ¶ 18.)

On May 23, 1993, the medical unit was advised that the plaintiff claimed that he had not been eating because he had been taken off his therapeutic diet. After many requests to go to the medical clinic to have his weight and vital signs checked, the plaintiff finally agreed to be escorted to the medical unit on May 29. While at the clinic, the plaintiff refused to respond verbally to questions or to make eye contact, and he refused requests to weigh him or take his blood pressure. There were no visible signs of weight loss. He was advised that a long-term hunger strike could adversely affect his surgery if he developed any abnormal bloodwork as a result of not eating. (Defs.' 10(j) ¶ 49; Vacca Aff. ¶ 40.)

On May 30, 1993, the plaintiff again refused to go to the medical unit for evaluation concerning his alleged hunger strike. On May 31, he was given a direct order to go to the medical unit for an examination. The plaintiff would not speak and refused to cooperate with having his weight or blood pressure taken. (Defs.' 10(j) ¶ 50; Vacca Aff. ¶ 41.)

On June 14, 1993, the plaintiff was admitted to St. Agnes Hospital for excision of his left submandibular salivary gland calcification. The surgery was performed on June 15, 1993. (Defs.' 10(j) ¶ 51; Vacca Aff. ¶ 42; Russ Aff. ¶ 19.)

The plaintiff also alleges that defendant Salavac, the x-ray technician at Shawangunk, failed to inform him about the long-term risks of radiation, (Cook Aff. ¶ 45), and that Mary Kurta, a registered nurse, failed to record all of the plaintiff's visits to the infirmary in a log-book, (Compl. ¶ 27).

## II.

█ Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Because the plaintiff appears *pro se,* the complaint, "however inartfully pleaded," must be held to less stringent standards than formal pleadings drafted by lawyers. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

Section 1983 imposes civil liability on any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. 42

U.S.C. § 1983.[2] There is no dispute in this case that the defendants' alleged actions arose under color of state law. The only issue is whether these actions deprived the plaintiff of his constitutional rights. The plaintiff claims the defendants violated his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.

All of the defendants seek summary judgment on the grounds that the plaintiff has not proffered sufficient evidence to support his claim that they violated his Eighth Amendment rights, and that even if he has, their actions were protected under the doctrine of qualified immunity. In addition, defendants Coughlin, Coombe, Cunningham, Greifinger, and Mann claim that their lack of personal involvement in the case warrants entry of summary judgment in their favor. The defendants also argue that the plaintiff's Fourth Amendment claim has no merit because the disclosure of medical records does not constitute a violation of the Fourth Amendment. The defendants make no arguments in their papers with respect to the plaintiff's Fourteenth Amendment claim.

### A.

The heart of the plaintiff's complaint is that the defendants violated his Eighth Amendment rights by allegedly improperly removing him from a medically prescribed soft-food diet and by delaying elective surgery to remove a salivary glandstone.

 The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment upon prison inmates. *Farmer v. Brennan*, 511 U.S. 825, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway*, —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). In *Estelle v. Gam-*

*ble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to an inmate's serious medical needs fell within the scope of the Eighth Amendment's prohibition. *Id.* at 104, 97 S.Ct. at 291; *Hathaway*, 37 F.3d at 66. The Court determined that such behavior amounted to the "unnecessary and wanton infliction of pain" that comported with the traditional understanding of what the Eighth Amendment proscribed. *Id.* at 104, 97 S.Ct. at 291.

 Under *Estelle*, prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs by denying or delaying his access to medical care or by intentionally interfering with his treatment. *Id.* at 104–05, 97 S.Ct. at 291–92. In *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir.1994), the Court of Appeals for the Second Circuit explained that the determination of whether a defendant acted with deliberate indifference to a plaintiff's serious medical needs involves both objective and subjective components. The objective component requires a determination of whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. *Id.* at 66. The subjective component requires an examination of the official's state of mind. *Id.* As the Court of Appeals explained,

> [d]eliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.... More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* at 66–67 (quoting *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1979). Accordingly, to

**2.** Title 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

establish an unconstitutional denial of medical care, the prisoner must show two things: first, that the deprivation alleged is "sufficiently serious," and second, that the official acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, at ——, 114 S.Ct. at 1977; *Hathaway*, 37 F.3d at 66.

### 1.

■ The plaintiff claims that some of the defendants violated his Eighth Amendment right because they improperly removed him from his medically prescribed soft-food diet. The plaintiff alleges that defendant Jay Squillace, the Food Services Administrator at Shawangunk, acted outside the scope of his authority by arbitrarily removing the plaintiff from his medically prescribed diet without proper authorization. The plaintiff's claims against Cunningham and DeGaust arise from the fact that these two defendants investigated the plaintiff's claim that he was improperly removed from his special diet and found that the plaintiff's complaint was without merit.

■ The denial of a medically proscribed diet may constitute an Eighth Amendment violation under certain circumstances. *See Robles v. Coughlin*, 725 F.2d 12, 15–16 (2d Cir.1983); *Mandala v. Coughlin*, 920 F.Supp. 342, 353 (E.D.N.Y.1996); *Johnson v. Harris*, 479 F.Supp. 333, 336–37 (S.D.N.Y.1979) (Weinfeld, J.) (finding violation of Eighth Amendment where there was a continued failure to provide a diabetic inmate with a medically appropriate diet, resulting in a decline in his health). Mere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation, however. "Deliberate indifference" must be demonstrated by proof that corrections personnel intentionally denied, delayed access to, or interfered with the prescribed treatment. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291–92.

The record fails to support and indeed refutes the plaintiff's contention that Squillace removed him from a special diet out of deliberate indifference to the plaintiff's medical needs. It is undisputed that the plaintiff was not in fact eating his special meals, and that in response Squillace recommended that

Allyn remove the plaintiff from his diet program. The plaintiff has not presented any evidence indicating that the procedure Squillace followed was improper. Allyn, not Squillace, ultimately removed the plaintiff from his diet, and there is no evidence that Allyn did this with deliberate indifference to the plaintiff's dietary needs, especially given the undisputed fact that the plaintiff was served the meals but refused to eat them. The plaintiff's claims against defendants Cunningham and DeGaust concerning his diet program are also unsupported by any evidence of deliberate indifference. Indeed, they are only accused of conducting an investigation that accurately determined that they was no basis for the plaintiff's complaint.

Because the plaintiff has failed to present a disputed issue of material fact concerning his claims against defendants Squillace, Cunningham, and DeGaust in connection to his dietary needs, their motion for summary judgment is granted.

### 2.

The defendants also move for summary judgment dismissing the plaintiff's Eighth Amendment claim based on the plaintiff's allegation that the defendants subjected him to cruel and unusual punishment because he had to wait almost three years for surgery to remove a salivary glandstone. The defendants contend that they are entitled to judgment both because the plaintiff's medical condition was not sufficiently serious and because the plaintiff has failed to demonstrate that the defendants were deliberately indifferent to his medical needs.

■ As the Court of Appeals for the Second Circuit has explained, the alleged deprivation of medical care must be, in objective terms, "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.1996); *Hathaway*, 37 F.3d at 66. This standard prescribes not only the denials of medical treatment that result in "torture or lingering death," but also those denials of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103, 97 S.Ct. at

290; *see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977); *Koehl,* 85 F.3d at 88 (suggesting that it is not necessary for the medical deprivation to cause pain as long as the deprivation prolongs suffering).

There are genuinely disputed issues of material fact concerning whether the plaintiff's medical condition was "sufficiently serious" that cannot be resolved as a matter of law on a motion for summary judgment. Although the plaintiff's salivary stone was not life-threatening, the plaintiff alleges that the condition caused him considerable pain and suffering, and that the defendants prolonged this pain and suffering by delaying his treatment. All of the doctors who examined the plaintiff determined that surgery was an appropriate measure to alleviate the plaintiff's pain and suffering, the plaintiff was continuously given prescriptive painkillers, and the defendants failed to present any evidence to undermine the plaintiff's claim that his medical condition was serious and caused him considerable pain.[3] The plaintiff's allegations are sufficient to constitute a serious medical need. *See, e.g., Koehl,* 85 F.3d at 88 (deprivation of prescriptive eye glasses constitutes denial of serious medical need; although deprivation did not cause pain, it prolonged plaintiff's suffering); *Hathaway,* 37 F.3d at 67 (finding plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (denying defendants' motion to dismiss plaintiff's Eighth Amendment claim based on wrist and ankle injuries caused by shackles); *Gill v. Gilder,* No. 95 Civ. 7933, 1996 WL 103837, at *5 (S.D.N.Y. Mar. 8, 1996) (Sweet, J.) (denying defendants' motion to dismiss where plaintiff had alleged that a back problem caused him "severe pain"); *Candelaria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7–8 (S.D.N.Y. Mar. 1, 1996) (Sand, J.) (denying cross-motions for summary judgment because the parties disputed whether plaintiff's medical claims based on failure to provide proper wheelchair, failure to provide doctor-ordered heating pad, and refusal to treat blood in his urine were "serious" medical conditions); *Orr v. Hoke,* No. 91 Civ. 1256, 1995 WL 217541, at *3 (S.D.N.Y. Apr. 12, 1995) (Preska, J.) (rejecting defendants' argument on summary judgment motion that delay of treatment for a severed finger did not cause plaintiff severe pain); *Davidson v. Kalonick,* No. 84 Civ. 6985, 1986 WL 3775, at *2 (S.D.N.Y. March 21, 1986) (holding that plaintiff who alleged he was in pain and discomfort after a bilateral otoplasty sufficiently showed a serious medical need; noting that "pain, though subjective and difficult to measure, may well be serious). The fact that the plaintiff's surgery was elective "does not abrogate the prison's duty, or power, to promptly provide necessary medical treatment for prisoners." *Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989); *see also Hathaway,* 37 F.3d at 64–69 (upholding a jury verdict on Eighth Amendment claim in favor of plaintiff where defendants delayed plaintiff's elective hip surgery for two years).

The defendants argue that even if the plaintiff has shown that he had a serious medical need, he has failed to present any evidence that the defendants were deliberately indifferent to this medical need because at most he has alleged that the defendants were negligent. The defendants claim that the record demonstrates that the defendants made continual efforts to treat and care for the plaintiff, and that any delays in his treatment were not due to the action or lack of action of any particular defendant but rather due to circumstances beyond their control.

The defendants correctly argue that medical malpractice is not actionable under the Eighth Amendment. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *see Hathaway,* 37 F.3d at 68 (citing *Estelle* ). Thus, when a plaintiff's allegations constitute at most medical malpractice, summary judgment dismissing the claim is appropriate. *See Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991),

**3.** The plaintiff is not required to present expert medical testimony to support his claims in order to survive summary judgment. *Hathaway,* 37 F.3d at 68.

cert. denied, *502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (citing* Estelle *). Summary judgment is not available, however, where the plaintiff has presented evidence that would permit the trier of fact to conclude that the medical treatment or lack thereof constituted deliberate indifference.* See Bryant, *923 F.2d at 984;* Liscio v. Warren, *901 F.2d 274, 276 (2d Cir.1990);* Kaminsky v. Rosenblum, *737 F.Supp. 1309, 1317 (S.D.N.Y. 1990) (Leisure, J.),* appeal dismissed, *929 F.2d 922 (2d Cir.1991).*

▇ With respect to defendants Salavac and Nurse Kurta, the plaintiff has failed to present any evidence that would permit the trier of fact to conclude that these defendants acted with deliberate indifference to the plaintiff's medical needs. The plaintiff appears to argue that defendant Salavac, the x-ray technician at Shawangunk, violated his Eighth Amendment rights because she failed to warn him of the foreseeable risks of x-ray radiation, and that Nurse Kurta violated his Eighth Amendment rights because she failed to record all of his visits in the infirmary log book. The plaintiff has not presented any evidence or indeed even argued that these alleged failures contributed in any way to the delayed removal of the plaintiff's salivary glandstone or that it caused him any sort of pain or suffering. In addition, the plaintiff has failed to proffer any evidence suggesting that these alleged failures were the result of deliberate indifference to the plaintiff's serious medical needs. The allegations against Salavac and Nurse Kurta at most amount to negligence, which does not amount to a constitutional violation. Accordingly, the defendants' motion for summary judgment with respect to the claims against Salavac and Nurse Kurta must be granted.

▇ In contrast, the evidence the plaintiff has proffered with respect to Recht, Vacca, and Allyn raise genuine issues of material fact concerning whether they treated the plaintiff's medical condition with deliberate indifference. The plaintiff alleges that Allyn is generally responsible for the delay in the plaintiff's treatment because he supervised all medical care at Shawangunk, Vacca is generally responsible for the delay because she supervised the medical and dental de-

partments at the facility, and Recht is responsible because he was the plaintiff's treating physician at the facility. The plaintiff claims that all three were responsible for assuring that the plaintiff's salivary glandstone was treated in a prompt manner, and the defendants have not presented any evidence to the contrary. The plaintiff makes the following allegations, all of which have evidentiary support: Recht did not immediately tell the plaintiff that a x-ray revealed that he had a glandstone; Stein was not sent the CAT scan films necessary for the evaluation he was supposed to make on the plaintiff's condition; Stein also did not receive the CAT scan films on the day he was to operate on the plaintiff; and a two-month delay gap between appointments resulted when a March 9, 1992 appointment was cancelled and rescheduled for April 6, 1992. Although these allegations taken separately may be mere negligence, taken together these allegations give rise to issues of fact concerning whether the defendants' actions were the result of mere negligence or deliberate indifference to the plaintiff's serious medical needs. *See Brown v. Coughlin,* 758 F.Supp. 876, 882–83 (S.D.N.Y.1991) (Duffy, J.) (denying motion to dismiss where repeated instances of denied treatment, such as substantial delays in follow-up appointments, failure to transfer necessary records, and improper treatment could lead the finder of fact to conclude prison officials acted with deliberate indifference). "Indeed it is well-settled in this circuit that 'a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.'" *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (quoting *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974)); *Brown,* 758 F.Supp. at 882–83 (pattern of suffering "might be taken to show that the described incidents were not 'accidents,' 'inadvertent failures,' or random occurrences of medical malpractice"); *Langley v. Coughlin,* 709 F.Supp. 482, 484 (S.D.N.Y. 1989) (Sand, J.) (quoting *Todaro* ); ·compare *Lee v. Carlson,* 645 F.Supp. 1430, 1437 n. 26 (S.D.N.Y.1986) (Weinfeld, J.) (noting that the defendants' non-action might be considered to be a part of a pattern of conduct against the plaintiff involving numerous other prison

personnel, but since only one instance of non-action is alleged, dismissal of Eighth Amendment claim is proper). Although one isolated failure to treat, without more, is ordinarily not actionable, it "may in fact rise to the level of a constitutional violation if the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment." *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987).

As the Court of Appeals for the Second Circuit stated in *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984),

> [i]t appears from the affidavits filed by appellees that [appellant's] case may well be without merit [because] ... appellant received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that the defendants provided [appellant] with comprehensive, if not doting, health care. Nonetheless, [appellant] does raise material factual disputes, irrespective of their likely resolution.

*See also Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988) (quoting this passage from *Archer* and denying summary judgment on Eighth Amendment claim); *Gill v. Gilder,* 1996 WL 103837, at *4–5 (same); *Eng v. Coughlin,* 684 F.Supp. 56, 64 (S.D.N.Y.1988) (Leisure, J.) (same). Because the plaintiff has raised factual issues concerning whether the defendants Allyn, Recht, and Vacca acted with deliberate indifference to his medical needs, the motion for summary judgment by these defendants to dismiss the claims against them is denied.

**3.**

■ Defendants Coughlin, Coombe, Cunningham, Greifinger, and Mann are also entitled to summary judgment because the plaintiff has made no showing that they were personally involved in the alleged Eighth Amendment violation.

■ Although it is undisputed that the supervisory defendants had direct or indirect supervisory authority over the medical staff, this fact alone is insufficient to hold them personally liable for damages for constitutional violations alleged under § 1983. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

Supervisors may be held liable only if they are personally involved in actions that cause the deprivation of constitutional rights. *Id.* Personal involvement for these purposes means "[1] direct participation, or [2] failure to remedy the alleged wrong after learning of it, or [3] creation of a policy or custom under which unconstitutional practices occurred, or [4] gross negligence in managing subordinates." *Id.; Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Here, the plaintiff alleges that the supervisory defendants had actual knowledge about the delay in his treatment but they were grossly negligent in managing the actions of their subordinates and in remedying the situation.

■ The plaintiff has failed to present any evidence to support his claim that the supervisory defendants were personally involved in the alleged deprivation of his constitutional rights. Prison supervisors cannot be deemed "personally involved" on the sole allegation that they responded to a plaintiff's letter complaining about his medical treatment. *See Garrido v. Coughlin,* 716 F.Supp. 98 (S.D.N.Y.1989); *Eng v. Coughlin,* 684 F.Supp. 56, 66 (S.D.N.Y.1988) (granting summary judgment even though plaintiff had written to the defendant about his allegations in part because the defendant had taken appropriate action by directing the Inspector General to investigate the plaintiff's complaints). As the plaintiff acknowledges, supervisory officials are also generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment. *See White v. Farrier,* 849 F.2d 322, 327 (8th Cir.1988); *Smiley v. Westby,* No. 87 Civ. 6047, 1994 WL 519973, at *8 (S.D.N.Y. Sept. 22, 1994) (Preska, J.) ("[A] warden who receives assurances from his medical staff that an inmate is receiving appropriate care will ordinarily be insulated from § 1983 liability."); *Sylwestrowicz v. Todd,* No. 3:95–CV–0218RP, 1995 WL 519769, at *2 (N.D.Ill. Aug. 10, 1995) (dismissing complaint against prison superintendent where he referred prisoner's grievance to medical department for response); *Liscio v. Warren,* 718 F.Supp. 1074, 1082 (D.Conn. 1989) (Cabranes, J.), *rev'd on other grounds,*

901 F.2d 274 (2d Cir.1990) (granting summary judgment to prison administrator, who "justifiably may defer to the medical expert regarding treatment of inmates/patients" when there is no evidence that administrator was reckless in his supervision of subordinates).

Here, the supervisory defendants acted appropriately when the plaintiff complained to them about his diet and his medical treatment. With respect to the plaintiff's complaints that he was deprived of a medically prescribed soft-food diet, defendants Mann, Coombe, Cunningham, and Greifinger investigated this complaint and found that it had no basis. The defendants were entitled to rely on the judgment of the medical staff that the diet had been discontinued because the plaintiff had refused to eat the specially prescribed meals and that the discontinuance had no side effects in any event. Similarly, defendants Mann, Cunningham, Coombe, Greifinger, and Coughlin responded adequately to the plaintiff's complaints concerning the delay in his surgery. Cunningham responded in May 1991 to the plaintiff's April 26, 1991 letter to Mann and stated that he had learned that the plaintiff had been uncooperative with his medical treatment and that Cunningham had found no information to support the plaintiff's medical claim. Greifinger, who responded to the plaintiff's April 26, 1991 letter to Coombe on May 29, 1991, investigated the plaintiff's complaint and was assured that the plaintiff had an appointment for the surgery in the very near future. Coughlin, who did not learn of the delay until August 1991, was correctly informed that the plaintiff's surgery had been cancelled because of problems with his bloodwork and that the surgery would be rescheduled once the bloodwork was normal. There

is no allegation that the defendants had reason to distrust the competence of the medical department. Compare *Smiley*, 1994 WL 519973, at *8–9 (denying summary judgment because the prison warden had reason to believe that medical staff was deficient); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir.1989) (denying summary judgment to prison supervisors because plaintiff had repeatedly complained about delay in dental treatment).

Because the plaintiff has failed to present any evidence that the supervisory defendants Coombe, Greifinger, Coughlin, and Mann were grossly negligent in managing the actions of their subordinates by failing to remedy their allegedly unconstitutional actions, their motion for summary judgment must be granted.[4]

### 4.

The defendants claim that even if the plaintiff has presented sufficient evidence to support a finding that they acted with deliberate indifference to the plaintiff's serious medical needs, they are entitled to summary judgment dismissing the plaintiff's Eighth Amendment claims in any event on grounds of qualified immunity. At this juncture, the issue of qualified immunity is relevant only to defendants Allyn, Vacca, and Recht because the plaintiff's Eighth Amendment claim has been dismissed with respect to the other defendants.

 Qualified immunity shields government officials from liability for civil damages when they are sued in their personal capacity as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, insubstantial lawsuits.[5] *Lennon v.*

---

**4.** While these defendants also claim that they are entitled to summary judgment on qualified immunity grounds, it is unnecessary to reach that defense in view of the conclusion that the plaintiff cannot establish his claim that the defendants violated his rights under the Eighth Amendment.

**5.** Generally, the Eleventh Amendment bars suits brought by private parties against a state in its own name. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993). However, in a section 1983 action, immunity depends initially on the capacity in which the official is sued.

Here, the plaintiff is suing the defendants in both their official and individual capacities. To the extent that the plaintiff's suit is against the defendants in their official capacities, the suit is deemed to be against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See Ying Jing Gan*, 996 F.2d at 529. Furthermore, suits for monetary awards from the state treasury are deemed suits against the state and are therefore barred. *See Edelman v. Jordan*, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974). Accordingly, the plaintiff's claims for

*Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *see also Zavaro v. Coughlin,* 970 F.2d 1148, 1153 (2d Cir.1992).

 Three factors must be considered to determine whether these defendants' actions violated the plaintiff's clearly established right: (1) whether the right in question was defined with "reasonable specificity;" (2) whether relevant decisional law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his actions were unlawful. *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995).

There is no question that a significant delay in treatment for a serious medical condition may constitute a violation under the Eighth and Fourteenth Amendments. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Liscio,* 901 F.2d at 276–77; *Hathaway v. Coughlin,* 841 F.2d 48, 50–51 (2d Cir.1988).

 Although the plaintiff's right to prompt medical treatment was clearly established at all times relevant to this suit, the defendants are still entitled to summary judgment on qualified immunity grounds, however, if they can demonstrate that the particular factual circumstances made it such that it was "objectively reasonable" for the defendants to believe that their actions were lawful. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987); *Rodriguez v. Phillips,* 66 F.3d at 475; *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987). The objective reasonableness test is met—and the defendant is entitled to qualified immunity—if it was "objectively reasonable" for the defendant officials to believe

that their acts did not violate the plaintiff's constitutional rights. *Rodriguez,* 66 F.3d at 475. A defendant official is entitled to summary judgment on this ground if the defendant has produced "such uncontroverted facts that a jury—drawing all inferences favorable to plaintiff—would have to conclude that it was objectively reasonable for defendant to believe his actions did not violate an established federally protected right." *Id.*

 Disputed issues of material fact prevent a determination of whether the defendants Allyn, Recht, and Vacca are entitled to qualified immunity. If the trier of fact were to find that the defendants acted with deliberate indifference to the plaintiff's serious medical needs, then it could not be said that it was "objectively reasonable" for these defendants to believe that their actions did not violate the plaintiff's constitutional rights. *See Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (denying summary judgment on qualified immunity grounds because "[a] three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding" of a constitutional violation); *Orr,* 1995 WL 217541, at *3 (denying defendants' motion for qualified immunity because "[t]here can be no doubt that a reasonable person would have known on April 19, 1990 that deliberate delay in providing a prisoner medical attention upon knowledge of his medical condition would violate the clearly established rights of the prisoner."); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 (S.D.N.Y.1990) (Leisure, J.) (denying summary judgment on grounds of qualified immunity because there were issues of fact concerning each defendant's involvement in the plaintiff's medical care and the quality of that care).

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's Eighth Amendment claim alleged against Recht, Vacca, and Allyn is denied.

## B.

 The plaintiff also alleges that the defendants violated his Fourth Amendment

monetary damages against the defendants in their official capacities are barred by the Eleventh Amendment.

rights because they affixed his medical records to their motion for summary judgment.

It is unnecessary to determine whether the plaintiff's medical records were improperly disclosed to the Court because even if they were, such action would not constitute a violation of the plaintiff's Fourth Amendment rights. *See Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir.1995). In addition, to the extent that the disclosure of these records violated state laws or regulations, such claims without more do not give rise to a constitutional violation. *See Zahra v. Town of Southold*, 48 F.3d 674, 682 (2d Cir.1995).

### C.

 The plaintiff also claims that he was denied his Fourteenth Amendment right to due process because he was denied adequate medical care. The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of the law...." U.S. Const. Amd. XIV, § 1. To allege a Fourteenth Amendment due process violation in this case, the plaintiff must allege that he was deprived of a constitutionally protected liberty interest. In determining whether state officials have deprived an inmate of such a protected "liberty" interest, the Supreme Court has recently instructed that constitutional liberty interests

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, — U.S. —, —, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (internal citations omitted); *Branham v. Meachum*, 77 F.3d 626, 630 (2d Cir.1996). Accordingly, the issue in the present case is whether the delay in medical care imposed an "atypical and significant hardship" on the plaintiff.

In their moving papers, which were submitted before *Sandin* was decided, the defendants did not explicitly move for judgment dismissing the due process claim, and even if they had done so, they clearly could not have addressed the *Sandin* standard. The plaintiff also did not address the due process issue in his brief in response to the motion, nor did the defendants in their reply brief.

Any argument for a violation of a liberty interest under the facts of this case as set forth in the papers may well be difficult to prove. *See Mandala v. Coughlin*, 920 F.Supp. 342, 352 (E.D.N.Y.1996) (granting summary judgment dismissing due process claim based on the denial of a special diet and of proper treatment for a shoulder injury); *Malsh v. Austin*, 901 F.Supp. 757, 760–61 (S.D.N.Y.1995) (granting motion to dismiss due process claim based on the adjournment of a dental appointment). Nevertheless, in view of the fact that the plaintiff is *pro se*, and in view of the fact that the defendants have not addressed the due process claim in their papers, summary judgment should not be granted dismissing that claim at this time. *See Branham*, 77 F.3d at 630 (vacating dismissal of Fourteenth Amendment claim to allow *pro se* litigant to amend complaint to allege sufficient facts to state a cause of action under *Sandin* ). The defendants may, of course, move for judgment on the pleadings or for summary judgment on this claim.

### CONCLUSION

For the reasons given above, the defendants' motion for summary judgment is (1) **DENIED** with respect to the plaintiff's Eighth Amendment claim against defendants Recht, Allyn, and Vacca; (2) **GRANTED** with respect to the plaintiff's Eighth Amendment claim against defendants Coughlin, Coombe, Greifinger, Mann, Cunningham, Squillace, Degaust, Salavac, and Kurta; (3) **GRANTED** with respect to the plaintiff's Fourth Amendment claim; and (4) **DENIED** with respect to the plaintiff's Fourteenth Amendment claim.

**SO ORDERED.**